**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

**IN RE:  James River Coal Company, et al**.

   Debtors.

United States Bankruptcy Court
Middle District of Tennessee
Nashville Division
Case No. 05-03550

Chapter 11

_____

Anthony H.N. Schnelling, as Trustee of the
JRCC Unsecured Creditor Liquidating Trust,

   Plaintiff,

v.

James B. Crawford, James D. Dotson,
William E. Macaulay, Ben A. Guill,
John A. Hill, George S. Slocum, John C.
Bumgarner, Jr., A. Hugh Ewing, III,
Edward A. Snyder, John R. Tellmann,
Derrick Varney, J.R. Coal Associates,
First Reserve Corporation, American Gas &
Oil Investors, AMGO II, First Reserve
Fund V, L.P., First Reserve Fund V-2, L.P.,
and First Reserve Fund VI, L.P.

   Defendants.

Adv. Pro. No. 06-03037-KRH

_____

### <u>AMENDED MEMORANDUM OPINION</u>

   Before the Court are the several motions to dismiss filed by the various defendants in this

adversary proceeding.  Hearing on the motions was held on October 12, 2006, at which time the

Court took the matters under advisement.  For reasons set forth below, the Court will deny the

motions in part and grant the motions in part.

# FACTS

## Procedural History

In March 2003, Debtor James River Coal Company ("JRCC") and its twenty-one subsidiaries (collectively, "the Debtors") filed voluntary bankruptcy petitions (the "Petitions") under Chapter 11 of the Bankruptcy Code. Those Petitions were filed in the United States Bankruptcy Court for the Middle District of Tennessee (the "Tennessee Bankruptcy Court"). On April 22, 2004, the Tennessee Bankruptcy Court confirmed the Debtors' joint plan of reorganization (the "Reorganization Plan"). Pursuant to the Reorganization Plan, the estates of JRCC and its 21 subsidiaries were substantively consolidated.[1] A liquidating trust was formed to hold and distribute the pooled assets (the "Trust"), and various causes of action, including claims against certain former employees, officers, directors and shareholders of the Debtors, were assigned and conveyed to the Trust.

On March 20, 2005, Plaintiff Anthony H. Schnelling, as Trustee of the Trust (the "Trustee"), filed this adversary proceeding in the Tennessee Bankruptcy Court against certain former officers, directors and shareholders of the Debtors. In addition, the adversary complaint named as defendants J.R. Coal Associates ("J.R. Coal") and First Reserve Corporation, American Gas & Oil Investors, Limited, AMGO II Limited Partnership, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., and First Reserve Fund VI, L.P. On June 27, 2005, the

---

[1]  In large corporate reorganizations, it is not unusual for bankruptcy courts to confirm plans of reorganization that call for the "substantive consolidation" of the different corporate entities comprising the corporate group. Douglas G. Baird, *Substantive Consolidation Today*, 47 B.C. L. Rev. 5 (December 2005). Substantive consolidation eliminates the intercompany liabilities and combines the assets of separate corporations. Third-party liabilities of the combined companies are satisfied from the pooled assets. Substantive consolidation assures the equitable distribution of property to all creditors by merging the separate corporations into a single entity for purposes of distribution. *See Helena Chem. Co. v. Circle Land and Cattle Corp. (In re Circle Land and Cattle Corp.)*, 213 B.R. 870, 874-75 (Bankr. D. Kan. 1997) (substantive consolidation allows "the general creditors of the separate entities to share in pooled assets"); *In re Cooper*, 147 B.R. 678, 683 (Bankr. D.N.J. 1992) (in substantive consolidation, corporate entities are merged "to correct prior harm or prevent future harm to creditors"). *See generally,* Mary E. Kors, *Altered Egos: Deciphering Substantive Consolidation*, 59 U. Pitt. L. Rev. 381 (Winter 1998).

complaint in this adversary proceeding was amended (the "Amended Complaint").   The Amended Complaint contains fifteen counts.

On or about July 18, 2005, several of the defendants filed motions to transfer the adversary proceeding to the Bankruptcy Court for the Eastern District of Virginia.  The motions were granted by the Tennessee Bankruptcy Court on December 23, 2005.  After the transfer, several defendants moved the District Court to withdraw the reference from the bankruptcy court.  That motion was denied by the United States District Court for the Eastern District of Virginia on June 1, 2006.

The matter is now before this Court on motions to dismiss filed by the defendants listed below pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure.

### The Defendants

James B. Crawford ("Crawford") was a founder and a major shareholder of JRCC. Crawford was also the chief officer of each of the Debtors and Chairman of each of the Debtors' Boards of Directors until March 18, 2003.

James A. Dotson ("Dotson") was a founder and a major shareholder of JRCC.  Dotson was also an officer of each of the Debtors, including the president of the largest subsidiary of JRCC, McCoy Elkhorn, and a member of each of the Debtors' Boards of Directors through November 27, 2002.

William E. Macaulay ("Macaulay") was a member of the JRCC Board of Directors from 1994 until January of 2000.  During that time, Macaulay was also an officer and/or director of defendant First Reserve Corporation.

Ben A. Guill ("Guill") was a member of the JRCC Board of Directors from 2000 until November 2002.  During that time, Guill was also an officer and/or director of defendant First Reserve Corporation.

John A. Hill ("Hill") was a member of the JRCC Board of Directors from 1994 until November 2002.  During that time, Hill was also an officer and/or director of defendant First Reserve Corporation.

The Amended Complaint refers to Guill, Hill and Macaulay as the "First Reserve Directors" and refers to Crawford, Dotson and the First Reserve Directors as the "Insiders."

George S. Slocum ("Slocum") was a member of the JRCC Board of Directors from 1994 through the filing of the Petitions.

John C. Bumgarner, Jr. ("Bumgarner") was a member of the JRCC Board of Directors from 1996 through early 2003.  Bumgarner was allegedly an outside, but not independent, director. Bumgarner was also an officer of a company which had a preferred stock arrangement with JRCC.

A. Hugh Ewing, III ("Ewing") was a member of the JRCC Board of Directors from 1988 through the filing of the petitions. Ewing was allegedly an outside, but not independent, director. Ewing also provided investment banking services to the Debtors through his firm, Ewing, Monroe & Company.

Edward A. Snyder ("Snyder") was a member of the JRCC Board of Directors from 1999 through the filing of the Petitions.

The Amended Complaint refers to Slocum, Bumgarner, Ewing and Snyder as the "Outside Directors."   The Insiders and the Outside Directors collectively comprise the "Directors."

John R. Tellmann ("Tellmann") was an officer and director of JRCC's subsidiary, James River Coal Sales, Inc., and was a shareholder of JRCC.

Derrick Varney ("Varney") was an officer of one or more of the Debtor corporations. Varney was also a shareholder of JRCC.

J.R. Coal Associates, LLC, ("J.R. Coal") was a partnership used by its general partners, Crawford and Dotson, to conduct various transactions with the Debtors.

The Amended Complaint refers to defendant American Gas & Oil Investors, Limited Partnership ("AMGO I"), defendant AMGO II, Limited Partnership ("AMGO II"), defendant First Reserve Fund V, L.P. ("Fund V"), defendant First Reserve Fund VI, L.P. ("Fund VI"), and defendant First Reserve Fund V-2, L.P. ("Fund V-2") as the "First Reserve Funds."

First Reserve Corporation ("First Reserve Corp.") is a Delaware corporation with its principal place of business in Greenwich, Connecticut.  The First Reserve Funds were major shareholders of JRCC.  First Reserve Corp., as managing general partner of each of the First Reserve Funds, managed the relationship and communications between the First Reserve Funds and the Debtors on a consolidated basis.  The Amended Complaint refers to First Reserve Corp. and the First Reserve Funds collectively as "First Reserve."

## The Trustee's Allegations

The court must take as true the factual allegations in the Trustee's Amended Complaint. *Bass v .E. I. DuPont de Nemours & Co.*, 324 F.3d 761, 764 (4th Cir. 2003)

JRCC was a corporation organized under the laws of the Commonwealth of Virginia. JRCC was the holding company for the 21 affiliate Debtors.  The Debtors were a Kentucky coal mining operation.   The 21 subsidiaries of JRCC controlled all operational aspects of their

respective mines, hired and fired employees, and contracted with vendors on an individual basis. The subsidiaries of JRCC held all of the assets of the Debtors and earned all of the revenue.

Through a series of investments during the period of time between 1994 and 1996, First Reserve Funds obtained the controlling shareholder interest in JRCC through the acquisition of 9,438 shares of JRCC.  The controlling shareholder interest was managed by First Reserve Corp.

In connection with First Reserve's controlling shareholder investment in JRCC, First Reserve and JRCC entered into two put option agreements, the first in 1994 and the second in 1995.  These agreements provided First Reserve with the option to "put" (sell) the 9,438 shares back to the Debtors within sixty days from issuance of the 1998, 1999 and 2000 year-end audited financials of the Debtors.  Formulas for determining the price of the puts were set forth in the put option agreements.

A separate shareholder agreement provided First Reserve with veto power over corporate actions of JRCC, restricted founder stock redemptions, and controlled who could hold stock in JRCC.  In addition, the shareholder agreement provided JRCC with a right of first refusal in connection with the sale of shares of JRCC.

The Trustee asserts that by the end of 1999, the Debtors were insolvent and that the Directors were aware, or should have been aware, of the insolvency.  He further asserts that the Insiders and First Reserve began to orchestrate a series of transactions that were unfair to the Debtors and/or their creditors.

There are three categories of conduct central to the Trustee's Amended Complaint.  The Trustee alleges that over $63,000,000 of the Debtors' property was fraudulently and/or preferentially transferred to First Reserve and other corporate insiders while the Debtors were insolvent through equity redemptions and equity put option transactions.  The Trustee alleges

that the Directors and the controlling shareholders caused the Debtors to enter into a series of unfair transactions in which the Directors and shareholders were directly interested (thus acting in derogation of their duties to the Debtors and the Debtors' creditors.)  Finally, the Trustee complains that more than $6,700,000 of the Debtors' property was fraudulently and/or preferentially transferred to Crawford just days before the Debtors filed bankruptcy.

The Trustee seeks to avoid and recover the following fraudulent and/or preferential transfers:

**The Dotson Redemption** – In December 1999 and while the Debtors were alleged to have been insolvent, JRCC paid Dotson, an officer and director of the Debtors, $11,463,100 in cash for his equity in JRCC.  The purchase price was calculated in accordance with the formula found in the put option agreements.  The Trustee claims that the actual market value of the stock was substantially less than the formula-derived amount paid to Dotson.  JRCC financed the Dotson Redemption with a nine-month unsecured note that it obtained from First Union for $9,000,000.

**The Varney Redemption** – In February 2000, and while the Debtors were alleged to have been insolvent, Varney, who was an officer of one of JRCC's subsidiaries, was paid $383,690 for his shares of JRCC stock.  Varney was paid in cash, and the price was calculated in accordance with the formula found in the put option agreements.  The Trustee alleges that the shares of JRCC stock were virtually worthless at the time of the Varney Redemption.

**The Tellmann Redemption** – In April 2000, and while the Debtors were alleged to have been insolvent, Tellmann, who was an officer of one of JRCC's subsidiaries, was paid $1,053,810 for his shares of JRCC stock.  Tellmann was paid in cash, and the price was calculated in accordance with the formula found in the put option agreements.  The Trustee

7

alleges that the shares of JRCC stock were virtually worthless at the time of the Tellmann Redemption.

**The First Reserve Exit** – Beginning in August of 2000 and while the Debtors were alleged to have been insolvent, First Reserve, the Debtors' controlling shareholders, began to implement a plan to divest itself of all of its equity in the Debtors.  The first step was the "First Reserve Redemption," in which First Reserve was paid approximately $37,000,000 for 3,094 of its shares in JRCC, under the put option agreements.  JRCC financed this transaction through a $50,000,000 refinancing agreement with First Union and Prudential (the "Refinancing").  The Amended Complaint alleges that the exercise of the put option was improper under the terms of the put option agreements and was unsupported by consideration.  The Amended Complaint alleges that First Reserve forced the Debtors to incur a continuous put option that had a chilling effect on potential new lenders and investors who were disincented from investing in the company because any investment immediately would be swept out of the company to cash out equity.

By 2001, the Debtors were unable to meet their budget and defaulted on the Refinancing.  Nonetheless, the Directors continued to operate the businesses, at the expense of the Debtors and their creditors.  Crawford is alleged to have stated that he would never place the Debtors in bankruptcy.  In June 2002, JRCC waived its right of first refusal under the Shareholder Agreement to enable First Reserve to sell its last remaining shares in JRCC to Crawford.  The stock transaction transferred the controlling interest in JRCC to Crawford.

**The Crawford Payoff** – In 2003, days prior to the filing of the Petitions, the Directors entered into a series of transactions with Crawford, Dotson and J.R. Coal.  The "Crawford Payoff" consisted of (1) $1,360,000 to be paid to Crawford upon the completion of a

restructuring or sale of assets, (2) the transfer of annuity/mutual fund assets as well as key-man life insurance policies with a combined market value in excess of $1,680,000, (3) the forgiveness of loan balances totaling $1,555,271, (4) health and other insurance coverage for life, and (e) purported releases among Crawford, J.R. Coal and JRCC.   The Crawford Payoff was substantially embodied in a settlement agreement executed on March 17, 2003 (the "Crawford Settlement Agreement). The "Dotson Payoff" consisted of the forgiveness of the obligation owed by Dotson or J.R. Coal to JRCC for $2,700,000 related to certain life insurance policies.

In order to obtain plan confirmation, the Debtors agreed to assume the Crawford Settlement Agreement, but the order of the Tennessee Bankruptcy Court approving the compromise allegedly carved out the purported releases from the assumption.  Under the terms of the Debtors' subsequently confirmed Chapter 11 Reorganization Plan, all executory obligations not specifically assumed were rejected.  Crawford and Dotson had notice of the rejection of their purported releases but did not object to the rejection.

The Trustee refers to the Dotson Redemption, the Varney Redemption, the Tellmann Redemption, the First Reserve Exit and the Crawford Settlement in the Amended Complaint as the "Challenged Transactions."  The Amended Complaint further alleges that the Challenged Transactions were made with the intent to hinder, delay or defraud creditors, that the Debtors were insolvent or undercapitalized at the time the Challenged Transactions occurred, and that the Debtors failed to receive equivalent value in exchange for the Challenged Transactions.

The Trustee maintains that these alleged facts state claims for avoidance and recovery of fraudulent and preferential transfers, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conspiracy, unlawful distribution and waste, money had and received, deepening insolvency, corporate trust fund, and breach of contract.

## CONCLUSIONS OF LAW

The causes of action that were assigned and conveyed to the Trust were defined in the

Reorganization Plan as:

> [A]ll causes of action arising prior to the Effective Date that either (a) accrued to
> the Debtors as debtors in possession under chapter 5 of the Bankruptcy Code,
> including, but not limited to, any and all such Causes of Action[2] against parties
> who are identified on the Schedules; or (b) accrued to (i) unsecured creditors of
> the Debtors under applicable non-bankruptcy law prior to the Commencement
> Date, but are deemed under the Bankruptcy Code and applicable interpretive case
> law to be derivative to the Estates' interests and therefore become property of the
> Estates upon the commencement of the Chapter 11 Cases; or (ii) the Debtors or
> their Estates, in either case including, but not limited to, the Identified Actions;
> provided, however, the Trust Causes of Action shall not include (x) Causes of
> Action expressly released or discharged under the Plan, including, but not limited
> to, Causes of Action against the Senior Secured Lenders released pursuant to
> Section 4.2(i) of the Plan; and (y) the Retained Actions.[3]

The claims filed by the Trustee pursuant to the above assignment and as set forth in the

Amended Complaint are summarized below:

| Count | Theory of recovery | Asserted Against |
|---|---|---|
| 1 | Avoidance of fraudulent conveyances under § 548(a)(1)(A) of the Bankruptcy Code | Crawford, Dotson, J.R. Coal and First Reserve |
| 2 | Avoidance of fraudulent conveyances under § 544 of the Bankruptcy Code | Crawford, Dotson, J.R. Coal, First Reserve, Tellmann, Varney |
| 3 | Avoidance of fraudulent conveyances under § 548(a)(1)B) of the Bankruptcy Code | Crawford, Dotson, J.R. Coal and First Reserve |

---

[2]  The Reorganization Plan, § 1.1(10), defined "Causes of Action" as "all rights, claims, causes of action, defenses, debts, demands, damages, obligations, and liabilities of any kind or nature under contract, in tort, at law, or in equity, known or unknown, contingent or matured, liquidated, and all rights and remedies with respect thereto, including, without limitation, causes of action arising under Chapter 5 of the Bankruptcy Code or similar state statutes."

[3]  The Reorganization Plan, § 1.1(92), defined "Retained Actions as "all Causes of Action of the Debtors to enforce all rights related to the business affairs of the Reorganized Debtors with respect to the property interests that will vest in the Reorganized Debtors pursuant to the provisions of the Plan, including, but not limited to accounts, receivables, contract rights, leases, chattel paper, inventory, machinery, equipment, other tangible and intangible personal property, and all real property interests."

| 4 | Avoidance of fraudulent conveyances under § 544 of the Bankruptcy Code | Crawford, Dotson, J.R. Coal, First Reserve, Tellmann, Varney |
|---|---|---|
| 5 | Avoidance of preferential transfers under § 547 of the Bankruptcy Code | Crawford, Dotson, J.R. Coal and First Reserve |
| 6 | Recovery of avoided transfers under § 550 of the Bankruptcy Code | Crawford, Dotson, J.R. Coal, First Reserve, Tellmann, Varney |
| 7 | Disallowance of claims filed, pursuant to § 502(d) of the Bankruptcy Code | Crawford, Dotson, J.R. Coal, Tellmann, Varney |
| 8 | Breach of fiduciary duty | Directors and First Reserve |
| 9 | Aiding and abetting breach of fiduciary duty | First Reserve |
| 10 | Civil conspiracy | Hill, Guill, Macaulay, Crawford and Dotson (Insiders), and First Reserve |
| 11 | Corporate waste, unlawful distributions | Directors |
| 12 | Money had and received | Crawford, Dotson, J.R. Coal, First Reserve, Tellmann, Varney |
| 13 | Deepening insolvency | Directors and First Reserve |
| 14 | Corporate trust fund doctrine | Directors and First Reserve |
| 15 | Breach of the shareholder agreement and Unwinding of transactions void under the shareholder agreement | Dotson |

## **Standard of Review**

The standard to be applied in ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), as made applicable by Federal Rule of Bankruptcy Procedure 7012(b), is well established.  This Court will accept all factual allegations in the Amended Complaint as true, construe the Amended Complaint in a light most favorable to the plaintiff, and recognize that dismissal is inappropriate "unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim."  *Baird v. Rose*, 192 F.3d 462, 467 (4th Cir. 1999) (citation omitted); *Hishon v. King & Spalding*, 467 U.S.

69, 73 (1984) ("A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.").

### Choice of Law

The Tennessee Bankruptcy Court previously concluded that Virginia substantive law would apply to the non-core issues pled in this case.  In ruling that way, the court held that (1) the forum state must use its own law to determine choice of law questions, (2) Tennessee has adopted the internal affairs doctrine, which holds that corporate governance issues must be resolved in accordance with the laws of the state of incorporation, and (3) the law of Virginia, the state of incorporation, must thus be used to determine the fiduciary duties of the corporate actors.  The Trustee urges the Court to revisit this issue.[4]

The Trustee suggests that the Tennessee Bankruptcy Court relied mistakenly on a superseded pleading.  He argues that the opinion of the Tennessee Bankruptcy Court refers to the original complaint and not to the Amended Complaint, and, therefore, its legal conclusion is subject to attack.  In support of his argument, the Trustee relies on the case of *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356 (6th Cir. 2001).  That case is distinguishable from the case at bar.  Even if the Tennessee Bankruptcy Court did rely on the original complaint (which is not clear from the record), such reliance was certainly not prejudicial.  In *Bovee,* the trial court's reliance on a superseded pleading caused that court to dismiss the complaint before it with prejudice.  No such harm has occurred in this case.  Furthermore, there is no real difference between the original complaint and the Amended Complaint in so far as the choice of law

---

[4]  The Court notes that the appeal to the decision of the Tennessee Bankruptcy Court was voluntarily withdrawn. The Trustee is attempting to avoid the consequences of that action by asking this court to serve in an appellate role and overrule the decision of the Tennessee Bankruptcy Court.

analysis is concerned.  The law of state of incorporation will still determine the fiduciary duties of the corporate actors.

Assuming that this Court were required to embark upon its own analysis of the choice of law issues, the result of that analysis would be the same as the result reached by the Tennessee Bankruptcy Court.  The rules applicable to the choice of law in this case are those of Tennessee, the initial forum state.  *Bailey v. Chattem, Inc.,* 684 F.2d 386, 392 (6th Cir. 1982).[5]  Tennessee has adopted the "internal affairs doctrine, under which matters involving the internal affairs of a foreign corporation…should be resolved in accordance with the law of the state of incorporation." *Hicks ex rel. Union Pacific Corp. v. Lewis*, 148 S.W.3d 80, 84 (Tenn. Ct. App. 2003) (citation omitted).  Tennessee has codified the internal affairs doctrine at Tenn. Code Ann. § 48-25-105(c) (West 2006), which provides that "Chapters 11-27 of this title [known as the Tennessee Business Corporation Act] do not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state."

The Trustee urges that an exception exists to the internal affairs doctrine in Tennessee.  He argues that the internal affairs doctrine will apply unless there is a showing that some other state has a more significant relationship to the transaction or the parties.  *Bayberry Assocs. v. Jones*, No. 87-261-II, 1988 WL 137181, at *5 (Tenn. Ct. App. Nov. 9, 1988), *vacated on other grounds*, 783 S.W.2d 553 (Tenn. 1990).  The context of that qualification was as follows:

> The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and stockholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in

---

[5]  "[W]hen a lawsuit is transferred from one federal court to another pursuant to 28 U.S.C. § 1404(a), the transferee court is obliged to apply the choice-of-law rules that the transferor court would have applied." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.,* 386 F.3d 581, 600 (4th Cir. 2004); *but see Limor v. Weinstein & Sutton (In re SMEC, Inc.)*, 160 B.R. 86 (M.D. Tenn. 1993) wherein the court held that federal law, not the state law of the forum, should apply.

Section 6 [of the Restatement (Second) of Conflict of Laws][6]  to the parties and the transaction, in which event the local law of the other state will be applied.

1988 WL 137181, at *4, quoting Restatement (Second) of Conflict of Laws, section 309 (1969).

However, in making a choice of law decision, the Tennessee courts have been reluctant to find that the Restatement's "significant relationship" test has been satisfied or even applies at all. In the 2003 case of *Hicks ex rel Union Pacific Corp.  v. Lewis*, the Tennessee Court of Appeals held that "[e]ven assuming that the significant relationship test applies, however, the application of Tennessee's [law] is not mandated."  148 S.W.3d at 86.  Previously, the same court had refused to apply Tennessee law to an Arkansas corporation.  *See Amberjack, Ltd. v. Thompson*, No. 02A01-9512-cv-00281, 1997 WL 613676 (Tenn. Ct. App. October 7, 1997).

But even if the Court were to apply the factors set forth in section 6 of the Second Restatement of Conflicts (*see* n.6), the same outcome would result.  First, Tennessee does have a statutory directive to the contrary.[7]  Second, while the Trustee has made several arguments as to why the interests of Kentucky require the application of Kentucky law, none of those arguments is applicable to the actions of a corporate director of a foreign corporation.  Concerns such as the regulation of the mining industry regulate the actual day to day operations of the Debtors' mining business, not its corporate governance and structure.  Application of the factors in section 6 of the Second Restatement of Conflicts largely supports the choice of Virginia law as the

---

[6]  The Restatement (Second) of Conflict of Laws section 6(2) provides that in the absence of a statutory directive to the contrary, "the factors relevant to the choice of the applicable rule of law include:
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of the interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied."

[7]  See T.C.A. § 48-25-105(c) and discussion in text accompanying n. 8, *infra*.

governing substantive law of the non-core issues in this case.   The essence of the Trustee's claims in this case is that the directors of JRCC improperly approved transactions involving shareholders of JRCC, and that these transactions harmed the corporation.[8]   Each of the Challenged Transactions was approved by the Board of Directors of JRCC acting as a board at its headquarters in Virginia.   Accordingly, the alleged wrongful conduct occurred in Virginia. Certainly the officers, directors and shareholders of JRCC had the justifiable expectation that Virginia law governed their actions.   The documents and agreements among the corporate participants (some of which documents serve as the predicate for the breach of contract allegations in Count 15 of the Amended Complaint) all provide for the application of Virginia law.  The certainty, predictability and uniformity of result as well as the ease in the determination and application of the law to be applied strongly favor application of Virginia substantive law. Were the rule to be otherwise, corporate boards would never be sure what law would govern their actions in foreign jurisdictions.   *See Atherton v. FDIC,* 519 U.S. 213, 224 (1997) (the internal affairs doctrine "recognizes that only one State should have authority to regulate a corporation's internal affairs – matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders – because otherwise a corporation could be faced with conflicting demands.").

As all of the claims of the Trustee are based in one way or another upon alleged improprieties in corporate governance that caused harm to JRCC and its creditors, Section 6 of the Second Restatement of Conflicts strongly favors application of Virginia Law.  This Court

---

[8]   The Trustee states in the Preliminary Statement to his Consolidated Response to Defendants' Amended Motions to Dismiss and Motion to Strike Defendants' Extrinsic Evidence that he "seeks redress for the misconduct of directors, officers, and major shareholders of [JRCC] and its 21 subsidiaries…."

agrees with the conclusions drawn by the Tennessee Bankruptcy Court, and it will apply the substantive law of Virginia to the non-core claims asserted in this action.

Tennessee law, on the other hand, governs the procedural law, including the applicable statutes of limitations pertaining to the non-core claims. *See Goad v. Celotex Corp.,* 831 F.2d 508, 510 (4th Cir. 1987) ("When venue was transferred to the Western District of Virginia, the district court in Virginia was obliged to apply the same law that would have been applied by the Texas district court; only a change of courtrooms was effected. Since the Texas state courts would apply Texas' own statute of limitations to this action, under the traditional rule that the law of the forum applies to matters of procedure, the federal court in Virginia was required to apply the Texas statute.") (footnote and citations omitted); *see also Mackey v. Judy's Foods, Inc.* 867 F.2d 325, 328 (6th Cir. 1989) (". . .we must apply the procedural law, including the statutes of limitations, of the forum state."). The Court will apply the procedural law of Tennessee to the non-core claims asserted herein.

Certain of the defendants argue that the statute of limitations should not be treated as procedural for choice of law purposes. Citing *Limor v. Weinstein (In re SMEC, Inc.),* 160 B.R. 86 (M.D. Tenn. 1993), they advocate that under the "modern approach," choice of law questions relating to the statute of limitations should be decided the same way as other questions of choice of law. They suggest that the court in *Limor*, applying "the most significant relationship test," held that the New Jersey statute of limitations and not that of the forum state, Tennessee, governed the claims asserted in that case. However, the bankruptcy court in *Limor* actually applied federal law. It did not discuss or otherwise consider Tennessee's choice of law provisions.[9]

---

[9] Defendants argue that the Second Restatement of Conflicts advocates that choice of law questions relating to the statute of limitations should be decided in the same way as other choice of law questions. See Restatement (Second)

Precedent of United States Court of Appeals for the Fourth Circuit clearly and unambiguously requires this Court to apply the same law that a court in Tennessee would have applied. The Fourth Circuit, in *Goad v. Celotex,* commented on the procedural nature of statutes of limitation:

> It is felt, and we agree, that the principal purpose of limiting statutes is the prevention of stale claims, and that the repose of defendants is merely an incidental benefit of such statutes. *See Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945). Statutes of limitations, then, are primarily instruments of public policy and of court management, and do not confer upon defendants any right to be free from liability, although this may be their effect.

831 F.2d at 510 (footnotes omitted). As the Tennessee state courts would apply Tennessee's own statute of limitations to this action, under the traditional rule that the law of the forum applies to matters of procedure, this court is required to apply the Tennessee statute. *Id.* at 510.

## **Affirmative Defenses**

As noted by the United States Court of Appeals for the Fourth Circuit in *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993) and as applied in *Suarez Corp. Indus. v. McGraw,* 125 F.3d 222 (4th Cir. 1997), the multiple affirmative defenses set forth by the defendants face procedural hurdles.

> A motion under Rule 12(b)(6) is intended to test the legal adequacy of the complaint, and not to address the merits of any affirmative defenses. In the limited circumstances where the allegations of the complaint give rise to an

---

of Conflict of Laws § 142, Reporter's Notes. Section 142 of the Second Restatement of Conflicts was modified in 1988 to eliminate the procedural/substantive distinction from choice of law consideration. The modification was made out of concern over forum shopping. However, a year after that change to the Restatement had been effected, the Sixth Circuit applied the traditional test in *Mackey v. Judy's Foods, Inc.,* 867 F.2d 325, a case arising in Tennessee and involving Tennessee law. Later in 1993, the bankruptcy court in *Limor v. Weinstein,* 160 B.R. 86, declined to apply Tennessee law, and chose to rely on federal law instead, in order to apply the revised version of Section 142 of the Second Restatement of Conflicts. It certainly does not appear from this line of cases that Tennessee has adopted the 1988 revision to the Restatement. The court has found no case overturning *Mackey.* Furthermore, there is no concern about forum shopping in this case. Plaintiffs commenced this adversary proceeding in the court where the bankruptcy case was pending. It was the defendants who chose to file the bankruptcy case in Tennessee in the first instance rather than in Virginia where the holding company was headquartered.

affirmative defense, the defense may be raised under Rule 12(b)(6), but only if it clearly appears on the face of the complaint. *McCalden v. California Library Ass'n,* 955 F.2d 1214, 1219 (9th Cir.), *cert. denied,* --- U.S. ----, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 348-49 (2d ed. 1990) ("The complaint also is subject to dismissal under Rule 12(b)(6) when its allegations indicate the existence of an affirmative defense, but the defense clearly must appear on the face of the pleading." (footnotes omitted)). Because neither of the asserted defenses appears on the face of the complaint, it is inappropriate to address them in the current posture of the case. These defenses are more properly reserved for consideration on a motion for summary judgment.

4 F.3d at 250.

The proper inquiry for this Court is to determine whether any of the affirmative defenses asserted by the defendants clearly appear upon the face of the Amended Complaint.

Standing

The defendants have argued that the Trustee does not have standing to pursue the claims raised in the Amended Complaint.  They argue that the doctrine of *in pari delicto*, or "in equal fault," bars the Trustee from pursuing the claims on behalf of the Debtors.  That doctrine is used to bar a claim by a plaintiff who was a participant in the conduct giving rise to the claim.  *See Pinter v. Dahl*, 486 U.S. 622, 636 (1988) ("Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant.") (citation omitted).  The doctrine is inapplicable where fiduciaries are found to have been acting outside the scope of their employment or to have been engaged in self-dealing.  In such instances, the misconduct of a corporation's fiduciaries will not be imputed to the corporation as the fiduciaries would have had an interest adverse to the corporation.  *Official Comm. Of Unsecured Creditors v. American Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 479 (Bankr. S.D.N.Y. 2006).  Thus, in this case, if the defendants were acting outside the scope of their employment or were engaged in self-dealing, the doctrine of *in pari delicto* will not apply to bar the claims of the corporate

18

Debtors and consequently will not bar the claims of the Trustee. However, the actions of the defendants and the Debtors have not been proven, and consideration of questions of fact is premature and does not satisfy the standard for a dismissal under Rule 12(b)(6).

The defendants' argument that the claims were not properly assigned to the Trustee through the chapter 11 Reorganization Plan of the Debtors is nothing but a collateral attack upon the confirmed plan. The Tennessee Bankruptcy Court has already addressed this argument and ruled that "the debtors' Plan of Reorganization and other 'plan documents' adequately preserved preference causes and 'insider' causes of actions, thus avoiding the *res judicata* effects of confirmation." Case No. 303-04095 (Bankr. M.D. Tenn., September 14, 2006). The opinion of the Tennessee Bankruptcy Court is attached to this opinion as Exhibit 1. The logic set forth by the Tennessee Bankruptcy Court applies equally to the fraudulent conveyance claims and the other causes of action set forth in the Amended Complaint.

The defendants next argue that the Trustee lacks standing to pursue claims based upon injury to the Debtors' creditors. This argument is unpersuasive. The claims were assigned to the Trustee under the Debtors' Reorganization Plan, which specifically provided that the Trust causes of action included claims that accrued to unsecured creditors of the Debtors under applicable non-bankruptcy law. Further, the Reorganization Plan identified those actions that were being preserved. The list of preserved claims included all of the counts set forth by the Trustee in the Amended Complaint. The defendants' theory that the Trustee cannot pursue actions against them based upon wrongs to creditors was concisely rejected by the United States Court of Appeals for the Fifth Circuit in *Schimmelpennick v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 359-60 (5th Cir. 1999):

> To capsulize this legal framework for determining whether the trustee or an individual creditor is the appropriate actor, we categorize three kinds of action:

> 1) Actions by the estate that belong to the estate;
> 2) Actions by individual creditors asserting a generalized injury to the debtor's estate, which ultimately affects all creditors; and
> 3) Actions by individual creditors that affect only that creditor personally.

The trustee is the proper party to advance the first two of these kinds of claims, and the creditor is the proper party to advance the third.

*Id.*

The Court agrees with the approach taken by the Fifth Circuit. The Trustee has standing to bring the claims enumerated in the Amended Complaint. *CBS, Inc. v. Folks (In re Folks)*, 211 B.R. 378, 386-87 (B.A.P. 9th Cir. 1997) (permitting the trustee to pursue general creditor claims serves the orderly and equitable distribution of the bankrupt's assets); *Golden v. Primavera Familienstiftung (In re Granite Partners, L.P.)*, 194 B.R. 318, 327-28 (Bankr. S.D.N.Y. 1996) (claims for mismanagement, breach of fiduciary duty and corporate waste are property of the estate). None of the actions asserted by the Trustee is personal to a specific creditor. The alleged damage caused harm to the creditors generally. As a result, the claims may be asserted on behalf of the "bankruptcy estate and the Trustee has standing to pursue them." *See Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 507-09 (N.D. Ill. 1988).[10]

## Releases

Crawford, Dotson and J.R. Coal argue in their motions to dismiss that the Debtors' assumption of any obligation under the Crawford Settlement Agreement must be construed as an assumption of all terms of that agreement, including the purported release provisions. Crawford argues that when the Debtors assumed the Crawford Settlement Agreement, the release became binding upon the Debtors. Dotson and J.R. Coal argue that their releases were assumed by

---

[10] *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972) does not apply where claims are being brought on behalf of all the creditors as part of the bankruptcy estate. Furthermore, even if these claims were personal to individual creditors, which they are not, the assignment of such claims may be accomplished through a plan of reorganization. *Logan v. JKV Real Estate Servs. (In re Bogdan),* 414 F.3d 507, 511-12 (4th Cir. 2005), *cert. denied* 126 S.Ct. 1052 (2006).

implication.   Thus, they reason, the release relieves them of any liability to the Debtors and

derivatively, to the Trustee.

The general rule is that when an executory contract is assumed by a debtor, the contract is

assumed in its entirety.   Normally, the debtor cannot assume the benefits of the contract while

rejecting its burdens. *Adventure Resources, Inc. v. Holland*, 137 F.3d 786, 798 (4th Cir. 1998);

*U. S,. Dept. of the Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1472 (4th Cir. 1990).

This might suggest that the release provisions of the Crawford Settlement Agreement remain

applicable to Crawford.   However, the parties to a contract are free to modify it as between

themselves.   *Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 72-73, 306 S.E.2d 870, 873

(1983); *Cardinal Development Co. v. Stanley Constr. Co.*, 255 Va. 300, 305, 497 S.E.2d 847,

851 (1998).   That is apparently what happened here.   As part of the agreement to assume the

contract, the parties asked the Tennessee Bankruptcy Court to approve a compromise between

them whereunder the contract was modified to exclude the release provision.   That compromise

was approved by the Tennessee Bankruptcy Court's separate order entered on the same day that

the Debtors' chapter 11 Reorganization Plan was confirmed.   The Court held:

> (a) Nothing herein or in any order that may be entered by the Court confirming
> the Plan (the "Confirmation Order") including the assumption of the
> Settlement Agreement, shall be deemed an approval or disapproval by the
> Court of the Settlement Agreement Release Provisions; and
> (b) Nothing herein or in the Confirmation Order, including the assumption of the
> Settlement Agreement, shall be deemed or construed to enlarge, limit, modify
> or otherwise affect the Settlement Agreement Release Provisions as they
> existed on or after March 17, 2003.

Based upon the language of the Tennessee Bankruptcy Court's order, "approval or

disapproval" of the release provisions were "carved out" of the Debtors' assumption of the

Crawford Settlement Agreement.   The court's separate order provides that the issue of the

validity of the release provision remains an open issue that might still be challenged post-

confirmation.  The Reorganization Plan's assumption of the Crawford Settlement Agreement cannot be construed as a ruling upon the validity of the release provision.

As for Dotson and J.R. Coal, there is no implied assumption of executory contracts in bankruptcy.  *See Sealy Uptown v. Kelly Lyn Franchise Co.* (*In re Kelly Lyn Franchise Co.*), 26 B.R. 441, 444-45 (Bankr. M.D. Tenn. 1983); *In re Hodgson*, 54 B.R. 688, 690 (Bankr. W.D. Wis. 1985).  All executory obligations not specifically assumed were rejected under the terms of the confirmed plan.

## Statutes of Limitations

The defendants argue that some of the counts in the Amended Complaint are barred by the applicable statutes of limitation.  The Trustee replies that the actions about which he complains comprise one unified transaction; he argues that therefore, regardless of the limitation period, it is premature to address the issue until the facts are developed further.[11]  The Court agrees with the Trustee's argument.  It would be premature for the Court to deprive the Trustee of any of the asserted causes of action unless it is clear on the face of the Amended Complaint that the count is barred by the statute of limitations.  *C. T. of Va., Inc. v. Euroshoe Assocs.*, 953 F.2d 637 (4th Cir. 1992), 1992 WL 12307; *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978).  A statute of limitations cannot be applied in this case until the nature and timing of the transactions pertaining to it are clarified.  It is impossible to tell without actual proof whether there existed a single unified fraudulent scheme or whether the statutory period was tolled, and the Court must take the allegations of the plaintiff as true.  Therefore, the statute of limitations may not be used at this phase of the case to defeat any of the Trustee's claims.

---

[11]  The Trustee also argues that the bankruptcy filing tolled all causes of action as of the Petition Date.  In addition he argues that if the Defendants' alleged breaches of fiduciary duties were not discovered and reasonably should not have been discovered, the applicable limitation period would have been tolled.

<u>Absence of Specific Named Creditor</u>

The defendants argue that the case should be dismissed as the Trustee has not identified a specific creditor that was injured by the alleged wrongful transfers and behaviors.  The amended complaint alleges that at all relevant times, the Debtors had creditors with claims that arose before or within a reasonable time after the challenged transactions.  That alone should be sufficient.  A review of the opinion of the Tennessee Bankruptcy Court attached to this opinion as <u>Exhibit 1</u> reveals that the Disclosure Statement submitted by the Debtors sets forth numerous causes of action that the Official Committee of Unsecured Creditors in this case claimed had harmed unsecured creditors of the Debtors' estate across the board.  In this light, it would be promoting form over substance to dismiss any claim based upon the Trustee's failure to name one specific creditor[12] that was harmed by the actions of the defendants.  Considering the low threshold to be applied to motions to dismiss, dismissal is not appropriate to the case at this stage of the proceedings.  The Court cannot conclude at this point that the Trustee will not be able to present any factual basis that would allow him a recovery.

## **The Motions to Dismiss the Trustee's Asserted Actions**

<u>Count 1 - Avoidance Of Intentional Fraudulent Transfers
Pursuant To 11 U.S.C. §548(a)(1)(A)</u>

In Count 1, the Trustee seeks to avoid intentionally fraudulent transfers against defendants First Reserve, Crawford, J.R. Coal, and Dotson pursuant to 11 U.S.C. § 548(a)(1)(A)[13].  Specifically, the Trustee seeks to avoid three of the Challenged Transactions by

---

[12]  The Court notes that at the hearing conducted on October 12, 2006, plaintiff did identify one creditor that was harmed by the Defendants.

[13]  At the time of the Petition Dates, § 548 provided:  "The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 1 year before the date of the filing of the petition, if the debtor voluntarily or involuntarily -- (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."  *See* 11 U.S.C. § 548(a)(1)(A)

way of this claim:   (1) the First Reserve Exit; (2) the Dotson Payoff; and (3) the release provisions in the Crawford Settlement Agreement.   Crawford, Dotson, and J.R. Coal move to dismiss Count 1 for failure to allege fraudulent intent and for failure to plead fraud with particularity.   First Reserve seeks to dismiss Count 1 by claiming that the Trustee does not assert that the fraudulent transfer was made on or within one year before the date of the filing of the petition.

Transfers made with the actual intent to hinder, delay or defraud creditors may be avoided under § 548 of the Bankruptcy Code.   *See* 11 U.S.C. §548(a)(1)(A).   Crawford, J.R. Coal and Dotson argue that Count 1 fails to state a claim for relief and should be dismissed because it is the intent of the transferor – the Debtors – and not the transferee, that is relevant for purposes of § 548(a)(1)(A) of the Bankruptcy Code.   However, the fraudulent intent of an officer or director may be imputed to the Debtors for purposes of recovering an intentional fraudulent transfer.   *See Forman v. Jeffrey Matthews Fin. Group, Llc. (In re Halpert & Co.)*, 254 B.R. 104, 121 (Bankr. D.N.J. 1999); *see also Wilson v. RHS & Assocs. (In re Blazo Corp.)*, Adv. Pro. No 93-6087, 1994 WL 92405, at *4 (Bankr. N.D. Ohio Feb. 25, 1994) (imputing to the debtor the fraudulent intent of its president).   *See also Consove v. Cohen* (*In re Roco Corp.*), 701 F.2d 978, 984 (1st Cir. 1983) (imputing to corporation fraudulent intent of corporate officer and sole shareholder).   *Friehling v. Nielson (In re F&C Servs, Inc.)*, 44 B.R. 863, 872 (Bankr. S.D. Fla. 1984).   A corporation, being an entity created by law, is incapable of formulating or acting with intent.   Thus, for the purpose of recovering impermissibly transferred corporate assets and

---

(West 2003).   Effective April 2005, Congress has amended § 548 to double the look-back period to two years and clarify that transfers or obligations incurred "to or for the benefit of" insiders, such as benefits from "employment contracts," are subject to avoidance.   *See* 11 U.S.C.A. § 548(a)(1)(A) (West 2005).

thereby facilitating creditor recovery, the intent of the officers and directors may be imputed to the corporation.

With regard to the Dotson Payoff and the purported release provisions contained in the Crawford Settlement Agreement, the Amended Complaint states that the "Directors caused the Debtors to make transfers of their interests in property and/or to incur obligations with the actual intent to hinder, delay or defraud." Taking that allegation as true, as the Court is required to do in evaluating a motion to dismiss, the fraudulent intent of the Directors may be imputed to the Debtors. As for the First Reserve Exit, the Amended Complaint states that "the Insiders caused the Debtors to make transfers of their interests in property and/or to incur obligations with the actual intent to hinder, delay or defraud" creditors. Therefore, the fraudulent intent of the Insiders (Crawford, Dotson, Hill, Macaulay and Guill), as Directors, may also be imputed to the Debtors for purposes of this claim.

Crawford, Dotson and J.R. Coal next argue that Count 1 should be dismissed for failure to plead fraud with particularity pursuant to Rule 9(b)[14] of the Federal Rules of Civil Procedure, made applicable to this proceeding through Bankruptcy Rule 7009(b). If a fraudulent transfer claim details the transfers alleged to be fraudulent, the reasons the transfers are fraudulent, and the roles of the defendants in the transfers, it has been pled with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b). *See Forman v. Jeffrey Matthews Fin. Group, Llc. (In re Halpert & Co.),* 254 B.R. at 115-116. The Court finds that the requisite elements have in fact been pled sufficiently. The United States Court of Appeals for the Fourth Circuit, in *U.S. ex rel*

---

[14] "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *See* Fed. R. Civ. Pro. 9(b).

*Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003), explained the

reasoning behind the particularity requirement:

> First the rule ensures that the defendant has sufficient information to formulate a
> defense by putting it on notice of the conduct complained of…Second, Rule
> 9(b) exists to protect defendants from frivolous suits. A third reason for the rule
> is to eliminate fraud actions in which all the facts are learned after discovery.
> Finally, Rule 9(b) protects defendants from harm to their goodwill and
> reputation….[A] court should hesitate to dismiss a complaint under Rule 9(b) if
> the court is satisfied (1) that the defendant has been made aware of the
> particular circumstances for which [it] will have to prepare a defense at trial,
> and (2) that plaintiff has substantial prediscovery evidence of those facts.

*Id*. at 921.

For each of the three fraudulent transfers that the Trustee seeks to avoid through Count 1,

the Trustee alleges the details of the transfers by pleading the approximate date of the transfer,

the transferor, the initial transferee, the beneficiary and/or subsequent transferee, and the

approximate amount of each transfer.  The Trustee also alleges sufficient and detailed facts

regarding the roles of the defendants in connection with the transfers and the reasons why the

transfers are fraudulent.

Each of the Challenged Transactions at issue represents a situation in which insiders'

interests allegedly became superior to the claims of trade creditors with the latter receiving no

value, but instead having their interests severely impaired.  This fact, if proved, is, in and of

itself, grounds to avoid the transactions in question.  *See Consove v. Cohen* (*In re Roco Corp.*),

701 F.2d at 984 (upholding factual finding of actual fraud where stock was redeemed by an

insolvent corporation because "[f]raudulent intent does not require an intent to run the company

aground; it requires merely an intent to hinder or defraud creditors."); *see also* this Court's later

discussion of Count 14.

It is disingenuous for the defendants to attempt to shield themselves from liability based upon the allegation that the Trustee has failed to plead with sufficient particularity where, as here, the defendants possess knowledge regarding the subject transactions and the Trustee has limited access to such information without discovery.  *See Rieser v. Milford (In re Chari)*, 276 B.R. 206, 213-14 (Bankr. S.D. Ohio 2002) (trustee pled fraud with sufficient particularity, even with respect to speculative claims of additional transactions between debtors and defendant-transferees; although claims of additional transactions were vague, trustee had limited ability to access information at the pleading stage, and would not be required to include in his pleadings information only available from defendants through discovery).[15]

First Reserve seeks to dismiss Count 1 on the grounds that the First Reserve Exit did not take place within the one year look-back period provided by § 548 of the Bankruptcy Code.  In support of its position, First Reserve argues that the First Reserve Exit was not a single, unified transaction, and that the continuous put exercise did not transfer property of the Debtors.

For avoidance purposes, the Court may examine the structure of the Challenged Transaction, the knowledge and intent of the parties involved in it, and the Challenged Transaction's net effect.  *See Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 274 B.R. 71, 91 (D. Del. 2002); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995); *Yoder v. T.E.L. Leasing (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 998 (Bankr. S.D. Ohio 1990) (court looks beyond multi-component transfers to the essence of the transaction

---

[15]  In the case of a fraudulent transfer, the particularity requirements of Rule 9(b) are more relaxed.  *See Harrison v. Entertainment Equities, Inc., (In re Rave Commc'ns., Inc.)*, 138 B.R. 390, 395-96 (Bankr. S.D.N.Y. 1992) (complaint charging actual and constructive fraud satisfied fraud particularity requirements; complaint alleged either nonfunctional or nonexistent board of directors, transfer of assets for less than reasonably equivalent value; and knowledge of debtor's insolvency at time of transfer); *see also Grella v. Zimmerman ( In re Art & Co.)*, 179 B.R. 757, 764-64 (Bankr. D. Mass. 1995).  This requirement is relaxed even more when the plaintiff is a third party, such as a trustee, because a third party generally has less information on which to base its allegation.  *See Rosener v. Majestic Management, Inc. (In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005).

27

and its net effect).  If the numerous steps taken to transfer the debtor's property can reasonably be collapsed into a single, integrated plan that either defrauds creditors or leaves the debtor with less than equivalent value, the transaction may be avoidable.  *See CPY Co. v Ameriscribe Corp. (In re Charles P. Young Co.)*, 145 B.R. 131, 137 (Bankr. S.D.N.Y. 1992) (citations omitted).

The phrase "transfer or incur obligations" found in § 548 of the Bankruptcy Code is used in the "most comprehensive" sense, and it is intended to include every means and manner by which property can pass from the ownership and possession of another.  Any transaction that reduces or extinguishes valuable legal rights (such as the granting of a release) is subject to avoidance.  *See Weaver v. Kellogg*, 216 B.R. 563, 573 (S.D. Tex. 1997); *Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488, 1492 (5th Cir.); *Pirie v. Chicago Title & Trust Co.*, 182 U.S. 438 (1901); 11 U.S.C. § 101(54); *Official Comm. Of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.)*, 326 B.R. 301, 312 (Bankr. D. Del. 2005).

Applying the above principles, it is not "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Hishon*, 467 U.S. at 73.  The Trustee has pled facts sufficient to establish that the First Reserve Exit represented a single, unified transaction for purposes of the one year look back period provided by § 548 of the Bankruptcy Code.  Certainly, the structure and nature of the transaction are fact questions, thus making a motion to dismiss impermissible.  Accordingly, First Reserve's request that this claim be dismissed should be denied.  *See Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. at 138 (denying motion to dismiss where Trustee alleges that transactions were part of a scheme to defraud the debtor and its creditors); *Wieboldt*, 94 B.R. at 502-04 (facts showing that controlling shareholders and insider shareholders knew of entire structure of transaction, that

corporation was insolvent, and that funds received from intermediary were actually the debtor's funds, sufficient to survive motion to dismiss).

Finally, Crawford seeks to dismiss Count 1 on the grounds that the Debtors' assumption of the Crawford Settlement Agreement bars the Trustee from avoiding that transaction. Except for the release provisions that were carved out of the Crawford Settlement Agreement, the Trustee cannot avoid the transfers that were made to Crawford pursuant to the Crawford Settlement Agreement. The Crawford Settlement Agreement as modified by the parties and as approved by the Court's order was assumed by the Debtors pursuant to the Debtors' Reorganization Plan. By assuming the Crawford Settlement Agreement as modified, the Debtors accepted both the benefits and the burdens of the remainder of the contract. The Debtors could not assume the favorable aspects of the modified contract and reject the unfavorable aspects of the modified contract.[16] *U.S., Dept. of the Air Force v. Carolina Parachute Corp.*, 907 F.2d at 1472. As successor to the Debtors, the Trustee cannot avoid the modified contract that the Debtors assumed. *In re Superior Toy & Mfg. Co.,* 78 F.3d 1169, 1174 (7th Cir. 1996) (order entered by Court assuming contract "divests the trustee of subsequent claims to monies paid under the contract whether they were paid prepetition or postpetition."); *Alvarado v. Walsh (In Re L.C.O. Enters)*, 12 F.3d 938, 943 (9th Cir. 1993) (trustee cannot use preference action to avoid assumed contract); *Seidle v. GATX Leasing Corp.*, 778 F.2d 659, 665 (11th Cir. 1985) (trustee precluded as a matter of law from pursuing preference action based upon court approved agreement). As the release provisions were not part of the modified contract that was assumed, the Trustee may avoid the releases. *Weaver v. Kellogg,* 216 B.R. at 573 (granting of a release is

---

[16]  The Trustee seems to suggest that the Debtors only assumed the executory portions of the contract. But this is not the law. The contract being executory rendered it subject to assumption. Once assumed, the entire contract as modified became binding on the Debtors, not just the executory portions.

subject to avoidance).   Accordingly, Count I states a cognizable claim against Crawford only

insofar as it seeks to avoid the releases that were given to him or otherwise seeks to set aside any

transfer made outside of the Crawford Settlement Agreement.

Count 2 -Avoidance Of Intentional Fraudulent Transfers
Pursuant to 11 U.S.C. § 544(b) (Count 2)

The Trustee seeks to avoid intentionally fraudulent transfers under 11 U.S.C. §544(b) ("§

544(b)") and applicable state law in Count 2.[17]  Crawford, Dotson and J.R. Coal re-assert their

previous arguments that the Trustee fails to allege the requisite intent and fails to plead with

sufficient particularity.[18]  Defendants Varney and Tellmann urge dismissal of Count 2 on these

same grounds[19] and also on the grounds that documents attached to their Motion to Dismiss

establish that the stock repurchases were made in the ordinary course of business under the

Employee Stock Purchase plan, not in an attempt to defraud creditors.

Varney and Tellmann suggest that "ordinary course of business" and "fraudulent

transaction" are incompatible concepts.   They argue that if the transaction was made in the

ordinary course of business, it could not have been fraudulent.   The Court need not decide that

issue at this time.   The affirmative defense of "ordinary course of business" is a fact intensive

determination upon which the defendants have the burden of proof.   It is therefore not sufficient

to support a motion to dismiss at this point in the case.

---

[17]  Va. Code Ann. § 55-80 ("Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void.").

[18]  Count 2 states a claim against Crawford only to the extent it seeks to avoid the releases that were given to him or otherwise seeks to set aside transfers made outside the Crawford Settlement Agreement.

[19]  The intent of the Defendants Varney and Tellmann, who were not directors, cannot be imputed to the Debtors. However, the intent to hinder, delay or defraud of the other Debtors' Insiders may be so imputed.  If it is proven that other Defendants, with the intent to hinder, delay or defraud creditors, caused the Debtors to make fraudulent transfers to Defendants Varney and Tellmann, then the requisite intent will have been established.

The same analysis made in the discussion of Count 1 with respect to particularity of pleading is applicable in Count 2.  The requisite elements have been pled (the transfers alleged to be fraudulent, the reasons the transfers are fraudulent, and the roles of the defendants in the transfers) and the defendants have been given sufficient notice of the claims.  Therefore, the Court finds that Count 2 has been pled sufficiently to withstand a motion to dismiss.

<u>Count 3 - Avoidance Of Constructive Fraudulent Transfer
Pursuant to 11 U.S.C. § 548(a)(1)(B)</u>

Through Count 3, the Trustee seeks to avoid constructively fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B).  In its challenge to Count 3, First Reserve repeats the argument that the Trustee fails to assert a transfer within the one year look-back period.  For the same reasons discussed with regard to Count 1, those arguments fail.  First Reserve, Crawford, Dotson, and J.R. Coal seek dismissal of Count 3 on the ground that the Trustee cannot show lack of reasonably equivalent value.[20]  First Reserve also argues the June 2002 stock sale cannot constitute an avoidable transaction under § 548 of the Bankruptcy Code and that the June 2002 "waiver of first refusal" transaction was a product of reasonable business judgment.

Section 548(a)(1)(B) of the Bankruptcy Code allows a Trustee to avoid any transfer where the Debtors "received less than a reasonably equivalent value in exchange for such transfer or obligation," *and* the Trustee can satisfy one of three alternative grounds:  (1) the Debtors were insolvent or became insolvent as a result of the transfer; (2) the Debtors were left insufficiently capitalized following the transfer; or (3) the transferor intended to incur, or believed it would incur, debts beyond the debtor's ability to pay as such debts matured.  *See* 11 U.S.C.A. 548 (a)(1)(B) (West 2003).  The Trustee pleads that the Debtors received less than a

---

[20]  Count 3 states a claim against Crawford only to the extent it seeks to avoid the releases that were given to him or otherwise seeks to set aside transfers made outside the Crawford Settlement Agreement.

reasonably equivalent value and, in addition, has pled all three of the alternative grounds for

avoidance.  He has, as such, pled a viable claim for avoidance under § 548(a)(1)(B) of the

Bankruptcy Code.

The elements of § 548(a)(1)(B) of the Bankruptcy Code involve questions of fact that

may not be resolved through a motion to dismiss.  *See Forman v. Jeffrey Matthews Fin. Group,*

*Llc. (In re Halpert & Co.)*, 254 B.R. at 115 ("Since resolving this issue would require a fact-

intensive inquiry, it would be improper for the Court to decide it on a motion to dismiss."); 5

Collier on Bankruptcy ¶ 548.05[1][b] (Alan N. Resnick and Henry J. Sommer, eds., 15th ed.

1998) ("Whether the transfer is for 'reasonably equivalent value' in every case is largely a

question of fact, as to which considerable latitude must be allowed to the trier of facts") (citations

omitted); *Yoder v. T.E.L. Leasing (In re Suburban Motor Freight, Inc.)*, 124 B.R. at 998

("whether the amount of capital remaining in the hands of the debtor is unreasonably small is a

question of fact.") (citations omitted); *Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321

B.R. at 141) ("A plaintiff need not prove his case in a complaint.  When reviewing a motion to

dismiss, the court need not rule on the merits of the allegations or the defenses to those

allegations, but rather only whether the plaintiff is entitled to offer evidence in support of his

allegations.").

Even assuming that claims asserted under § 548(a)(1)(B) of the Bankruptcy Code are

subject to a Rule 12(b)(6) analysis, Crawford, Dotson, and J.R. Coal seek to dismiss Count 3

solely on the ground that the Trustee fails to plead a lack of reasonably equivalent value.  By

pleading, among others, facts related to the Debtors' trouble attracting investors and the Debtors'

bleak hopes of recovering from JRCC's insolvent state, the Trustee has pled sufficient facts to

evidence the lack of "reasonably equivalent value" conferred upon the Debtors by defendants'

fraudulent transfers.   The transfers of equity interests in an insolvent company are essentially valueless.  *In re Roco Corp.*, 701 F.2d at 982; *Cf, Rapids Constr. Co. v. Malone*, 139 F.3d 892 (4th Cir. 1998).   Additionally, the Trustee has pled the remaining elements of § 548 of the Bankruptcy Code by alleging that the Debtors were insolvent, undercapitalized and that defendants intended to incur obligations beyond the Debtors' ability to pay once the debts matured.

The defendants argue next that their *past* consideration constitutes equivalent value.  The Court rejects this argument:  *See O'Donnell v. Royal Bus. Group Inc. (In re Oxford Homes, Inc.)*, 180 B.R. 1, 11 (Bankr. D. Me. 1995) ("[D]efendants' claim that Royal 'gave value' when it invested in Oxford years before the LBO is specious.   To accept the argument would be to license any liquidation of investment at any time, creditors be damned.").  Value is measured at the time of the transaction and not with reference to past events.[21]  Even if it were appropriate to consider past consideration, the value of any past consideration is a question of fact, thereby making dismissing this count on motion improper.   The presence or absence of reasonably equivalent value is a question of fact which does not appear upon the face of the complaint and which therefore does not require dismissal.   As with other affirmative defenses and fact questions, the issue will be decided after discovery upon the filing of a properly supported motion for summary judgment or at trial.

### Count 4 - Avoidance Of Constructive Fraudulent Transfer
### Pursuant To 11 U.S.C. § 544(b)

The defendants argue that under Virginia Code § 55-81 a voluntary transfer may be avoided only if it is not supported by consideration "deemed valuable in law."  The United States Court of Appeals for the Fourth Circuit, in *C-T of Va. v. Euroshoe Assoc.*, 953 F.2d 637, 1992

---

[21]  In *Oxford Homes*, the court found that new capital devoted exclusively to liquidation of the selling shareholder's interest, adding nothing to Debtor's working capital, was not equivalent value.  180 B.R. at 8.

WL 12307, at *2 (4th Cir. 1992), held that the "consideration deemed valuable in law" standard

set forth in Virginia Code § 55-81 is different from the "reasonably equivalent value" standard

employed in the Bankruptcy Code.  That approach has been recently followed in this district:

> [I]t must be determined what the phrase "not upon consideration deemed valuable
> in law" means. This phrase has not been construed by the Virginia Supreme
> Court, but has been interpreted by the Fourth Circuit to mean that something of
> value must be gained. *C-T of Virginia v Euroshoe Associates,* 762 F.Supp. 675
> (W.D. Va.1991), aff'd, 953 F.2d 637 (4th Cir.1992) (table decision) [hereinafter
> *C-T 1*]. That court explicitly found that the consideration does not have to be
> reasonably equivalent to what is being given up. *C-T of Virginia v. Euroshoe
> Associates,* No, 91-1578, 1992 WL 12307, at *1-3, *1-2, 1992 U.S.App. Lexis
> 1029, at *1-6, *4 (4th Cir. Jan. 29, 1992) (table decision reported at 953 F.2d 637)
> [hereinafter *C-T 2*]. Consideration that has been deemed valuable in the law has
> included the pre-payment of mortgage payments in exchange for the release of
> secured debt against property, *Shaia v. Meyer, In re Meyer,* 244 F.3d 352 (4th Cir.
> 2001), antecedent indebtedness in exchange for the conveyance of land,
> *Inspiration Coal, Inc. v. Mullins,* 690 F.Supp. 1502 (W.D. Va. 1988), and money
> in exchange for stock and control of a company, *C-T 1,* 762 F.Supp. 675.  The
> district court in the *C-T 1* case found that as long as something is gained, "that is
> enough [compensation] to prevent avoidance of the transaction" under Va.Code §
> 55-81. *Id. at* 678

*Wellington Apartment, LLC v. Clotworthy (In re Wellington Apartment, LLC)*, 350 B..R. 213,

245 (Bankr. E.D. Va. Aug. 24, 2006).

In the instant case, it appears from the face of the Amended Complaint that the Debtors

did receive the benefit of the Crawford Settlement Agreement and the various releases.

Although the value and sufficiency of that benefit is a question of fact, as long as something was

gained, that is enough to prevent avoidance of the transaction under Virginia Code § 55-81.  It is

not disputed that the Crawford Settlement Agreement as modified was assumed by the Debtors at

confirmation.  Something of value was obviously gained or the Tennessee Bankruptcy Court

would not have approved the assumption.  Therefore, Count 4 should be dismissed as to

Crawford.

As to the other defendants, whether value was exchanged does not appear conclusively from the face of the pleadings. The existence or absence of any value exchanged remains a question of fact. Accordingly, it is inappropriate to dismiss this count as to the other defendants on a motion to dismiss.

Varney and Tellmann argue that Count 4 fails because the Trustee does not allege an existing creditor for purposes of § 544(b) of the Bankruptcy Code. Section 544(b) permits the Trustee to step into the shoes of an unsecured creditor for purposes of fraudulent transfer and preference claims based on state law. *See* 11 U.S.C. § 544(b). The Trustee alleges through Counts 2 and 4 that at all relevant times the Debtors had creditors with claims that arose before or within a reasonable time after the subject transaction. Under the liberal rule of notice pleading, and for purposes of the defendants' Motions to Dismiss, this allegation is enough. The Trustee is not required to name the creditor, nor is it necessary that the claim held by that creditor at the time of bankruptcy remain identical to the claim held at the time of the transfer. *See Brandt v. Hicks Muse & Co. (In re Healthco Int'l, Inc.)*, 195 B.R. 971, 980 (Bankr. D. Mass. 1996) (citing *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 193 B.R. 451, 458-59 (Bankr. S.D. Ohio 1995)); *Aluminum Mills Corp. v. Citicorp N. Am. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 884 (Bankr. N.D. Ill. 1991).

<u>Count 5 - Avoidance Of Preferential Transfers Pursuant to 11 U.S.C.§ 547</u>

In the alternative to the fraudulent transfer claims detailed above, the Trustee seeks to avoid the First Reserve Exit, the Dotson Payoff, and the Crawford Payoff as preferential transfers. To state a cause of action to avoid a preferential transfer pursuant to 11 U.S.C. § 547(b), the Trustee must (1) identify the nature and amount of each antecedent debt and each alleged preferential transfer by date, name of debtor/transferor, name of transferee, and amount

of the transfer and (2) state such transfers (a) were made within 90 days or, if to an insider, within one year prior to petition date; (b) on account of antecedent debt; (c) while the debtor was insolvent; (d) allowed creditors to receive more than they would have received under liquidation; and, with respect to insiders, state that the transfer was (e) to, or for, benefit of insiders, and otherwise sufficiently pled insider status.  The Trustee has pled each of these elements with respect to the First Reserve Exit, the Dotson Payoff, and the Crawford Payoff.

Dotson argues that Count 5 fails because § 547(b) of the Bankruptcy Code requires a recipient of the transfer be a creditor.  Dotson asserts that he was not a creditor of the Debtors and that therefore he cannot be deemed to have received a preference.  However, the amended complaint characterizes the relationship between Dotson and the Debtors as that of debtor/creditor for purposes of the alleged preferential transfer.  Thus, the true nature of the relationship is a question of fact and may not be resolved pursuant to a motion to dismiss.

Dotson's alleged status as a debtor, rather than as a creditor, requires a factual determination that is inappropriate at the Rule 12(b)(6) stage.  It is not clear from the face of the Amended Complaint or the documents referenced therein that Dotson is a debtor rather than a creditor of the Debtors, and therefore the Court may not accept Dotson's assertion that he is a debtor rather than a creditor of the Debtors.

The Trustee has sufficiently pled every element required by § 547 of the Bankruptcy Code.  The Trustee has permissibly pled § 547 as an alternative to his § 548 and § 544(b) claims, in compliance with Rule 8 of the Federal Rules of Civil Procedure.  Therefore, Count 5 states a claim for relief and is not subject to dismissal under Rules 12(b)(6).

To the extent that the Crawford Payoff was part of the Crawford Settlement Agreement, Count 5 must be dismissed as against Crawford.

<u>Count 6 – Recovery of Transactions Avoided Through Counts 1-5</u>
<u>Pursuant to 11 U.S.C. § 550</u>

Through Count 6, the Trustee seeks to use 11 U.S.C. § 550 to recover the transfers and preferences avoided under §§ 548, 544(b), and/or 547 of the Bankruptcy Code for the benefit of the bankruptcy estate.  Dotson, J.R. Coal, Varney, and Tellmann claim that because Counts 1-5 should be dismissed, Count 6, as a dependent claim, should also be dismissed.  As the Court has concluded above that Counts 1-5 are viable claims seeking the avoidance of fraudulent transfers and preferences, the Trustee may seek to recover the avoided transactions pursuant to § 550 of the Bankruptcy Code.  Accordingly, Count 6 states a viable claim for relief.

<u>Count 7 – Disallowance of Claims Under 11 U.S.C § 502(c)</u>

In Count 7, the Trustee seeks to disallow the claims filed by Crawford, Dotson, J.R. Coal, Varney, and Tellmann against the Debtors' estate.  The Bankruptcy Code defines "claim" broadly, either as a right to payment -- whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured -- or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment -- whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. 11 U.S.C.A. § 101(12), (5).  *See also Callahan v. Petro Stopping Ctr. #72 (In re Lambert Oil Co., Inc.*, 347 B.R. 173, 179 (W.D. Va. 2006).

J.R. Coal, Varney, and Tellmann argue that they have not filed proofs of claim. Crawford argues that because he has filed a proof of claim and has received his payment, he therefore has no remaining claim against the Debtors' estate.  Based upon the representations of J.R. Coal, Varney, Tellmann and Crawford, Count 7 will be dismissed as against them.  To the

extent that the claims register reflects that any such claim has been filed and remains pending in the bankruptcy case, it is hereby disallowed.

<u>Count 8 – Breach of Fiduciary Duty</u>

In Count 8, the Trustee seeks to recover damages from the Directors and First Reserve for a breach of fiduciary duty.  The Trustee asserts that the Directors and First Reserve did not act in the best interests of the Debtors or their creditors when they undertook actions that approved the Challenged Transactions and when they allowed the Debtors to incur detrimental obligations to finance the Challenged Transactions.  The Trustee argues that the Directors wasted the assets of the subsidiaries of JRCC when they financed tens of millions of dollars of equity redemption and saddled the JRCC subsidiaries with debt obligations.  Instead of wasting the assets of the Debtors in this fashion, the Trustee argues that the assets could have been pledged as security in exchange for working capital or utilized to satisfy the Debtors' obligations to their creditors.  The assets should not have been used to cash out insider equity holders.  The Trustee asserts that these actions and failures were fraudulent, unconscionable, motivated by bad faith, or the product of undue influence.

The law of Virginia is clear that corporate directors have a fiduciary duty to the corporation and to its shareholders, and they must govern themselves accordingly.  Va. Code § 13.1-690;[22] *Byelick v. Vivadelli*, 79 F.Supp.2d 610, 623 (E.D. Va. 1999) ("It is well settled that

---

[22] Va. Code Ann. § 13.1-690 provides:
    A.  A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation.
    B.  Unless he has knowledge or information concerning the matter in question that makes reliance unwarranted, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:
        1.  One or more officers or employees of the corporation whom the director believes, in good faith, to be reliable and competent in the matters presented;
        2.  Legal counsel, public accountants, or other persons as to matters the director believes, in good faith, are within the person's professional or expert competence; or
        3.  A committee of the board of directors of which he is not a member if the director believes, in good

'[a] Virginia corporation's directors and officers owe a duty of loyalty both to the corporation and to the corporation's shareholders.'") (quoting, *WLR Foods v. Tyson Foods, Inc.*, 869 F.Supp. 419, 421 (W.D. Va. 1994)); *Glass v. Glass*, 228 Va. 39, 47, 321 S.E.2d 69, 74 (1984) ("Corporate officers and directors have a fiduciary duty in their dealings with shareholders and must exercise good faith in such dealings.").

Once a corporation enters the zone of insolvency, the fiduciary duties owed by the Directors extend also to the corporation's creditors. "[W]hen a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors, and that they cannot by transfer of its property or payment of cash, prefer themselves or other creditors." *Poth v. Russey*, 281 F.Supp.2d 814, 826 (E.D. Va. 2003) *aff'd* 99 Fed. Appx. 446 (4th Cir. 2004) (citing *FDIC v. Sea Pines Co.*, 692 F.2d 973, 977 (4th Cir. 1982)). "[D]irectors of a corporation are bound to act in discharge of their duties with prudence, vigilance and fidelity, and to apply its assets, in the event of insolvency, for the benefit of the creditors in preference to claims of stockholders or other persons…." *Planters Bank v. Whittle*, 1884 WL 5018 at *2 (Va. Apr. 24, 1884). The Trustee, having pled that while JRCC was insolvent the Directors engaged in or acquiesced in transactions in which they were self-interested, which were not fair to JRCC and which preferred shareholders over creditors, has properly alleged a claim for breach of fiduciary duty against the Directors.[23]

---

faith, that the committee merits confidence.

C. A director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section.

D. A person alleging a violation of this section has the burden of proving the violation.

[23] The safe harbor afforded to directors by the business judgment rule as codified in Virginia at Virginia Code § 13.1-690 must be asserted as an affirmative defense.

Dotson and the First Reserve Directors argue that the claims against them must be dismissed to the extent the claims are based on approval of transactions or other actions taken while they were not on the Board of Directors of JRCC. A corporate director cannot be held liable for board actions taken while not on the board. Claims against Dotson and the First Reserve Directors for breach of fiduciary duty must be based on actions that occurred prior to their resignations from the board. Once they had resigned from the Board, they cannot be held responsible for subsequent Board decisions. Questions concerning the timing of the resignations and concerning when and what decisions were made by the board while a member of it, are questions of fact that have been challenged by the Trustee. Accordingly, it is premature at this point to dismiss this Count completely as to Defendant Dotson and the First Reserve Directors.

The Outside Directors argue that the Trustee has failed to allege that they engaged in self-dealing and they urge that this failure defeats his claim under Virginia law. The Outside Directors rely upon *Bank of America v. Musselman*, 222 F.Supp.2d 792 (E.D. Va. 2002). The holding in *Musselman* was that allegations of self-dealing were necessary to state a claim for an *individual* creditor to bring a personal claim of breach of fiduciary duty against directors of an insolvent corporation. The court explained that under Virginia law "the general rule is that 'no *direct* action lies to a creditor of a corporation against its directors. . . for improper performance or failure in performance of their duties.'" *Id*. at 797 (quoting, *Anderson v. Bundy*, 161 Va. 1, 171 S.E. 501, 508 (1933)). The right to bring such an action belongs "to the corporation only or its legal successors to the right. The creditors must sue, not for any direct right of action in them, but in the right of the corporation after the corporation, or its proper representatives, have refused to act." *Anderson v. Bundy*, 161 Va. 1, 21, 171 S.E. 501, 508 (1933). Here, the direct right of action of the corporation has been assigned pursuant to the Reorganization Plan to the Trust, and

the Trustee is the proper representative to bring this action.[24]  In *Anderson* the court found that

the bank's manager and cashier had authorized excessive loans by the bank, along with other

irregularities, including embezzlement by the cashier.  The directors were held liable following

the bank's failure because they had trusted the cashier without proper efforts to ascertain the true

condition of the bank.  *Id.*  As in *Anderson*, the Trustee has sufficiently pled self-dealing with

respect to the Outside Directors by alleging that the Outside Directors permitted First Reserve

and the Insiders to engage in self-dealing transactions without fair consideration for their own

benefit and to the detriment of the Debtors.  *See also Official Comm. Of Unsecured Creditors of*

*RSL Com Primecall, Inc. v. Beckoff (In re RSL Com Primecall, Inc).*, No. 01-011457, 2003 WL

22989669, at *8-9 (Bankr. S.D.N.Y. Dec. 11, 2003).

        The Trustee maintains that he has stated viable claims against the Directors for breach of

fiduciary duties he claims the Directors of JRCC owed to its subsidiaries.  The Outside Directors

claim that there is no basis in law to impose any such duties on them.  The Outside Directors

maintain that their duty was to manage JRCC in the best interests of JRCC and its shareholders.

Imposition of a fiduciary duty on them for running the subsidiaries would subject them to

multiple and potentially conflicting duties.  *See Aviall, Inc. v. Ryder System, Inc.*, 913 F.Supp.

826, 832 (S.D.N.Y. 1996), *aff'd,* 110 F.3d 892 (2d Cir. 1997) ("the officers and directors of a

parent company owe allegiance only to that company and not to a wholly-owned subsidiary.").

*See also Lippe v. Bairnco Corp.*, 230 B.R. 906, 916 (S.D.N.Y. 1999) (dismissing claims against

directors of parent corporation because they did not owe a fiduciary duty to the wholly-owned

subsidiary corporation); *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174

(Del. 1988) (dismissing subsidiary's claim against parent corporation and three former directors

---

[24]    The Trustee is pursuing a generalized injury to the estate which ultimately affects all creditors.  *In re*
*Schimmelpennick*, 183 F.3d at 359-60.

of the subsidiary for breach of fiduciary duty between subsidiary and parent); *Resolution Trust Corp. v. Bonner*, Civ. A. No. H-92-430, 1993 WL 414679, at *3 (S.D. Tex. June 3, 1993) (a parent corporation does not owe a fiduciary duty to its wholly-owned subsidiary).

JRCC and each of its subsidiary corporations had separate Boards of Directors. The Outside Directors sat on none of the separate boards, only the Board of JRCC. Each subsidiary had a Board of Directors which was responsible for the management of that subsidiary's corporate affairs, and the Board of Directors for JRCC was not responsible for the management of the subsidiaries. All corporate powers were exercised by or under the authority of those separate Boards. Va. Code § 13.1-673. There is no basis in law or in policy to impress the Outside Directors with any fiduciary duties running to JRCC's subsidiaries.

This does not mean that claims of the subsidiaries' creditors cannot be advanced in this case. The Debtors' Reorganization Plan substantively consolidated the Debtors' estates. Substantive consolidation is a form of relief related to fraudulent transfer law. It is not strictly limited to cases in which fraudulent transfers have been proven. In fact, it can be an alternative to fraudulent transfer litigation. Substantive consolidation occurs when legally separate entities are actually part of a unified business operation. *In re Vecco Const. Industries, Inc.*, 4 B.R. 407, 409 (Bankr. E.D. Va. 1980) ("Due to the organizational makeup evidenced by the now common-place multi-tiered corporations in existence today, substantive consolidation of a parent corporation and its subsidiaries has been increasingly utilized as a mechanism to deal with corporations coming within the purview of the Act."). As one commentator has recently noted, truly separate corporations will never be substantively consolidated. Ultimately, substantive consolidation (like veil-piercing) boils down to the issue of when the court should disregard the corporate fiction because the corporations involved effectively disregarded it themselves. When

entities are effectively alter-egos and the allocation of assets and liabilities between them is not

based on economic reality, then the multi-tiered corporate structure should neither control

creditor recoveries nor put creditors in the position of spending inordinate amounts of time and

money to prove fraudulent transfers. Seth D. Amera and Allen Kolod, *Substantive*

*Consolidation: Getting Back to Basics*, 14 Am. B. Inst. L. Rev 1 (Spring, 2006).

That is apparently what happened in this case, in which the creditors were faced with the

prospect of dismantling a multi-tiered corporate structure and sorting out complex bank

financing that had resulted in all of the assets of the subsidiaries having been pledged in order to

permit the parent corporation to cash out insider equity.[25] Having failed to object to the

substantive consolidation of the various entities at confirmation of the Reorganization Plan, it is

not now possible for the Outside Directors to rely on their separate legal existence. That

separation no longer exists. That is not to say that new duties that the Outside Directors did not

owe at the commencement of the bankruptcy case now have sprung into existence. It is only that

the creditors of the subsidiaries are now also creditors of JRCC. The substantive consolidation

of the Debtors' estates provides a basis for all creditors to participate in any recovery to which

the Trustee might be entitled should he prevail on his claim that the Outside Directors breached a

duty that they owed to JRCC.

Finally, the Trustee asserts that First Reserve, as controlling shareholders of JRCC, also

owed fiduciary duties to JRCC. The Trustee alleges that as the controlling shareholders, First

Reserve exercised total dominion and control over the Debtors and acted as a *de facto* Director

through an overreaching veto power. On these facts, the Trustee maintains that the Supreme

Court of Virginia would find that the fiduciary duties of First Reserve's controlling shareholders

---

[25] The alternative would have been for each of the subsidiary corporations to have spent an inordinate amount of
time and money pursuing fraudulent conveyance claims against the parent.

were the same as the Directors' fiduciary duties, citing *Curley v. Dahlgren Chrysler-Plymouth, Dodge, Inc.*, 245 Va. 429, 429 S.E.2d 221 (Va. 1993). In *Curley*, the Supreme Court of Virginia reversed the trial court's dismissal of the defendant shareholders who had assumed the roles of directors and officers of an automobile dealership. The Court found that they had not only assumed the authority and fiduciary responsibilities of directors, but also the liabilities resulting from the exercise of those roles.

In *Curley*, the defendant shareholders had failed or refused to elect directors. In this case, it is alleged that JRCC had a duly constituted and functioning Board. It is well established under Virginia law that the "fundamental concept of a corporation is that it is a separate entity created under the law to enable a group of persons to limit their liability in a joint venture to the extent of their contributions to the capital stock. The property of the corporation is a basis for credit extended to it and those dealing with it are limited in their recovery to the property owned and possessed by the corporation." *Beale v. Kappa Alpha Order*, 192 Va. 382, 398, 64 S.E.2d 789, 798 (1951). "The proposition is elementary that a corporation is a legal entity separate and distinct from the shareholders or members who compose it. This immunity of stockholders is a basic provision of statutory and common law and it supports a vital economic policy underlying the whole corporate concept." *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 212, 360 S.E.2d at 828, 831 (1987); *Appalachian Power Co. v. Greater Lynchburg Transit Co.*, 236 Va. 292, 347 S.E.2d 10 (1988). "A refusal to recognize the ordinary immunity of stockholders is not only overturning a basic provision of statutory or common law, but is also contrary to a vital economic policy underlying the whole corporate concept." *Beale v. Kappa Alpha Order.* 192 Va. at 397, 64 S.E.2d at 797-98; *see also Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir. 1987).

The Trustee has not alleged any basis for piercing the corporate veil to make First Reserve, as shareholder, personally liable for the debts of JRCC. Under Virginia law, mere proof that a shareholder may "dominate or control" the corporation or may treat it as "mere department, instrumentality, agency" is not enough to pierce the corporate veil. A plaintiff must establish that the corporation was a "device or sham" used to "disguise wrongs, obscure fraud or conceal crime." *Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc.*, 974 F.2d 545, 548 (4th Cir. 1992) (citing *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 1a6 212, 360 S.E.2d at 831). Accordingly, the Trustee has failed to state a claim under Count 8 as to First Reserve and that Count will be dismissed as to it.

<u>Count 9 - Aiding And Abetting Breach Of Fiduciary Duty</u>

In Count 9, the Trustee asserts a claim against First Reserve in the alternative to its claim for breach of fiduciary duty found in Count 8. The Trustee alleges that First Reserve, with knowledge, offered substantial assistance and thus aided and abetted the Directors' breaches of fiduciary duty. Aiding and abetting a breach of fiduciary duty is a viable claim under Virginia law. See *Kieft v. Becker*, No. 194674, 2002 WL 481249 at *3 (Va. Cir. Ct. Jan. 31, 2002)(acknowledging claim for aiding and abetting breach of fiduciary duty) (citing *Tysons Toyota, Inc. v. Globe Life Ins. Co.*, 45 F.3d 428, 1994 WL 717598, at *3 (4th Cir. 1994)); *Sherry Wilson and Co., Inc. v. Generals Court, L.C.*, No. 21696, 2002 WL 32136374 at *1 (Va. Cir. Ct. Sept. 27, 2002)("one who assists another to breach his fiduciary duty to the beneficiaries of a trust may be held jointly and severally liable for the losses sustained as a result of such breach," (citing *Patteson v. Horsley*, 70 Va. (29 Gratt.) 263 (1877)). Under this theory, First Reserve would be held liable just as if First Reserve had committed the breaches of fiduciary duty. *See Tysons Toyota, Inc. v. Globe Life Ins. Co.*, 1994 WL 717598, at *3.

Defendants AMGO I, AMGO II, and Fund VI deny that they were parties to any of the alleged Challenged Transactions.  They maintain that they are not liable for aiding and abetting any breach of fiduciary duty that may have occurred because they received no benefit.  The Trustee has pled on the other hand that First Reserve Corp. was the managing general partner of all the First Reserve Funds.  The Trustee has alleged that the improper actions of First Reserve Corp. were undertaken with the design to cash out all the interests that each of the First Reserve Funds had in JRCC.

A determination of whether AMGO, AMGO II and Fund VI received benefits from the alleged transactions requires a factual inquiry that is inappropriate at this stage of the proceedings.  The identity of interest between AMGO, AMGO II and Fund VI with the other First Reserve defendants, as pled in the Amended Complaint, provides sufficient detail to survive the Motion to Dismiss.

Defendants' motion to dismiss the Trustee's claim for aiding and abetting breach of fiduciary duty must be denied .

<u>Count 10 – Conspiracy</u>

In Count 10, the Trustee alleges that the Insiders and First Reserve, in breach of their fiduciary duties and in their own self-interest, entered into a conspiracy with First Reserve to loot the Debtors.[26]  Crawford, Dotson and First Reserve argue that the Trustee has failed to plead a valid cause of action.  The Trustee maintains that he has properly pled causes of action for both statutory and common law conspiracy under Virginia law.  *See T.G. Slater & Son, Inc. v. The Donald P. and Patricia A. Brennan LLC*, 385 F.3d 836, 845-46 (4th Cir. 2004) (common law

---

[26]  First Reserve, the First Reserve Directors and Crawford argue that the Trustee does not have standing to bring Count 10 because the Trustee lacks standing to pursue claims on behalf of the Debtors' creditors. For the reasons stated above, that argument fails.

conspiracy consists of two or more persons combined to accomplish, by some concerted action, an unlawful purpose or some lawful purpose by unlawful means; statutory conspiracy consists of (1) two or more persons combining, agreeing, or mutually undertaking to (2) willfully and maliciously injure another in his reputation, trade, business, or profession) (citing Va. Code Ann. §§ 18.2-499, 500); *Commercial Bus. Sys., Inc. v. BellSouth Servs., Inc.*, 249 Va. 39, 47, 453 S.E.2d 261, 267 (1995).

The Trustee pleads that the Insiders combined, agreed, and/or mutually undertook to willfully and <u>maliciously</u> loot the Debtors.  He describes the unlawful acts that were taken in furtherance of this conspiracy.  These allegations state a viable claim under Virginia law for both statutory and common law conspiracy.  *See T.G. Slater & Son*, 385 F.3d at 845-46 (complaint stating that defendants intentionally, purposefully, and without lawful justification sought to complete transaction without paying commissions for work performed stated claim for both statutory and civil conspiracy under Virginia law).[27]

<u>Count 11 – Unlawful Distribution / Waste</u>

Count 11 sets forth a claim against the Directors for corporate waste and/or for unlawful distributions.  The Trustee claims that at the time of each of the Challenged Transactions, the Directors possessed knowledge and information that made the distributions unreasonable, unwarranted or the product of willful misconduct.  He further asserts that after the implementation of each Challenged Transaction, the Debtors were left in such a condition that they were unable to pay their debts as they became due in the usual course of business or that their liabilities exceeded their assets.

---

[27]  The allegations are sufficient to satisfy Rule 9(b) with regard to the Fraudulent Conveyances.

The Outside Directors claim that even if they are subject to the claims of the creditors of JRCC, they are not subject to the claims of creditors of the subsidiaries of JRCC. They also argue that the Trustee does not have standing to bring the actions for alleged unlawful distributions made to JRCC shareholders. The Court has previously addressed both of these arguments in its consideration of Count 8. The conclusions reached by the court there are totally applicable here.

The First Reserve Directors and Dotson argue Count 11 is barred as to them because they did not serve on the JRCC Board during the times that the alleged transactions occurred. These assertions are insufficient to support a motion to dismiss, as they necessarily involve disputed issues of fact.[28]

Finally, Crawford and Dotson argue that Virginia does not recognize a cause of action for waste of corporate assets. The Trustee asserts that Virginia courts do recognize common law waste and statutory unlawful distributions as viable causes of action, citing *Curley*, 245 Va. at 432, 429 S.E.2d at 223; *Williams v. Southern Scrap Co.*, No. 81-C-36, 1985 WL 306795 at *3 (Va. Cir. Ct. April 18, 1985); and *Meltzer v. Atlantic Research Corp.*, 330 F.2d 946, 949-50 (4th Cir. 1964).

"The cause of action for corporate waste has its origins in the common law of agency. Fiduciaries such as officers and directors are essentially agents of the corporation. A director or officer who intentionally or negligently facilitates the waste or mismanagement of corporate assets is liable for damages to the principal that flow from his conduct. Corporate waste as a cause of action is based on each fiduciary's duty of highest loyalty to the corporation. Waste is therefore similar to a claim for breach of fiduciary duty." *Pereira v. Centel Corp. (In re Argo*

---

[28]   The Trustee has asserted that the Debtors were damaged by a plan encompassing the period during which the defendants to this count were in fact serving on the board of directors of JRCC.

*Commc'ns Corp.*), 134 B.R. 776 (Bankr. S.D.N.Y. 1991). No Virginia court has explicitly held that there exists a common law claim for corporate waste under Virginia law. The Court views this claim as akin to the Trustee's claim for breach of fiduciary duty.

Virginia does have a statutory prohibition against unlawful distributions. At the time this complaint was filed, § 13.1-692 of the Code of Virginia provided:

> Unless he complies with the applicable standards of conduct described in § 13.1-690, a director who votes for or assents to a distribution made in violation of this chapter or the articles of incorporation is personally liable to the corporation and its creditors for the amount of the distribution that exceeds what could have been distributed without violating this chapter or the articles of incorporation.[29]

The Outside Directors argue that the Trustee lacks standing to contend that the execution of any alleged Fraudulent Conveyance was a breach of this statutory provision. They also claim that the cause of action is barred by the applicable statute of limitations. Those objections have already been considered by the court, and they are rejected in this context as well.

The Court notes that the Trustee has not asserted that this Count sounds only under Va. Code § 13.1-692. It could arise also under the common law theory, of which Va. Code § 13.1-692 is a codification, that it is a breach of a director's duty to enter into a stock redemption that renders a corporation insolvent. *Poth v. Russey*, 281 F.Supp.2d at 826 (citing *FDIC v. Sea Pines Co.*, 692 F.2d at 977).[30] Once a corporation enters the zone of insolvency, its Directors become required to apply the company's assets solely for the benefit of creditors to the exclusion of claims asserted by stockholders. *Planters' Bank v. Whittle*, 78 Va. 737, *2 (Va. 1884).

---

[29] This statute has subsequently been amended and now reads:

"A director who votes for or assents to a distribution made in violation of this chapter or the articles of incorporation is personally liable to the corporation and its creditors for the amount of the distribution that exceeds what could have been distributed without violating this chapter or the articles of incorporation if the party asserting liability establishes that when taking the action the director did not comply with § 13.1-690." Va. Code Ann. § 13.1-690 (2006).

[30] *See also* the discussion of the Trust Fund Doctrine in the discussion of Count 14, *supra*.

<u>Count 12 – Money Had And Received</u>

In Count 12, the Trustee seeks to recover the value of the alleged Fraudulent Conveyances from J. R. Coal, Dotson, Crawford, First Reserve, Tellmann, and Varney under the doctrine of money had and received.

In order to state a cause of action for assumpsit under Virginia law, the Trustee need only allege that the defendants are in possession of money which in equity and good conscience does not belong to them. This equitable doctrine was recognized by the Virginia Supreme Court in *Robertson v. Robertson*, 137 Va. 378, 119 S.E. 140, 141 (1923). It has been applied consistently by other Virginia courts. For example, in *Velesz v. Simanavichus*, 2001 WL 1830007, 58 Va. Cir. 87 (Va. Cir. Ct. 2001), a Virginia Circuit Court held that:

> Where a defendant possesses money that, in justice and fairness, she ought to refund, the law conclusively presumes that she has promised to do so. *See Robinson v. Robinson*, 137 Va. 378 (1923). Where the defendant has received money from a third person by law or authority through some mistake or fraud, which but for the mistake or fraud would have vested the right to the money in the plaintiff, the plaintiff may recover whenever, but for the mistake or fraud, he would have had unquestioned right to the money. *See, John C. Holland Ent. V. J.P. Mascaro & Sons*, 653 F.Supp. 1242 (E.D.Va. [1987]); *City of Norfolk v. Norfolk County*, 120 Va. 356 (1917). Such cases rest upon the plaintiff's original right to the money.

2001 WL 1830007, at *2.

The Trustee's allegations that First Reserve, Varney, Tellmann, Dotson, Crawford, and J. R. Coal are in receipt of money that "equitably belongs to another" are sufficient to state a cause of action which is only bolstered by the indicia of inequitable conduct in the form of allegations of fraudulent transfer and breach of fiduciary duty.

J. R. Coal and Dotson argue that the Trustee has not pled a cause of action as to them because they did not receive any money as part of the Crawford Payoff or the Dotson Payoff.

Once again this raises questions of fact, the resolution of which is not appropriate at this stage in these proceedings.

Varney, Tellmann, First Reserve and Crawford argue that they were contractually entitled to the monies they received and therefore were not unjustly enriched.  Each of them is alleged to have had stock redeemed while the corporation was insolvent.  As the facts are pled, it would appear that the interests of insider equity holders became superior to the interests of trade creditors.  Virginia courts have applied the rule adopted in *Robertson* to situations in which money is obtained by a party who uses "extortion; oppression; or any other undue advantage taken of the claiming party's situation, where the advantage is contrary to laws made for the protection of persons under those circumstances."  *Qualichem Inc. v. Xelera, Inc*., No. CL01-134, 2003 WL 23162331, at *3 (Va. Cir. Ct. June 19, 2003).  This is what the Trustee has alleged occurred.  The laws of corporate governance are meant to protect corporations from overreaching by their officers, directors, and insiders regardless of whether that overreaching is embodied in contractual form.[31]

### Count 13 – Deepening Insolvency

In Count 13, the Trustee seeks to state a tort claim for deepening insolvency against First Reserve and the Directors.  The Trustee alleges that these defendants, by virtue of their over-reaching, domination, and control over the businesses of the Debtors, fraudulently and/or negligently prolonged the corporation's existence for more than three years.  First Reserve and the Directors move to dismiss the count on the grounds that the tort of deepening insolvency has not been recognized in Virginia.

---

[31]  The Trustee cannot utilize this theory of recovery against Crawford to collaterally attack the confirmation order confirming the Debtors' Reorganization Plan.  To the extent that the monies Crawford is alleged to have received were part of the Crawford Settlement Agreement, they cannot "equitably belongs to another" and the Trustee will not be permitted to pursue their recovery under this theory.

The Virginia Supreme Court has not considered whether a cause of action for deepening insolvency exists as a separate tort in Virginia.  When questions of state law which have not been addressed by the highest or intermediate appellate courts of the state are presented to a federal court, the law requires the federal court to forecast what the state supreme court would hold if it were presented with the issue.  *Commissioner v. Estate of Bosch*, 387 U.S. 456 (1967), *Wilson v. Ford Motor Co.,* 656 F.2d 960 (4th Cir. 1981).  Therefore, this Court must "don the soothsayer's garb and predict how [the Virginia Supreme] court would rule if it were presented with the question." *Official Comm. Of Unsecured Creditors v. R. F. Lafferty & Co.*, 267 F.3d 340, 349 (3d Cir. 2001).

The origin of deepening insolvency can be traced to *Bloor v. Dansker (In re Investors Funding Corp. Secs. Litig.)*, 523 F.Supp. 533 (S.D.N.Y. 1980) in which the court found "[a] corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it." *Id.* at 541.  Deepening insolvency subsequently has been defined as "the 'fraudulent prolongation of a corporation's life beyond insolvency,' resulting in damage to the corporation caused by increased debt."  *Kittay v. Atlantic Bank (In re Global Serv. Group, LLC)*, 316 B.R. 451, 456 (Bankr. S.D.N.Y. 2004) (quoting *Schacht v. Brown*, 711 F.2d 1343, 1350 (7th Cir. 1983)).

The theory of deepening insolvency "holds that the acquisition of debt by an insolvent corporation can harm the corporation as well as its creditors by making it more difficult for the corporation to run a profitable business without resorting to bankruptcy." *Alberts v. Tuft (In re Greater Southeast Community Hosp. Corp. I)*, Adv. Pro. No. 04-10459, 2006 WL 2793177, at *2 (Bankr. D.D.C. 2006).  The theory of deepening insolvency has been viewed alternatively as a theory of damages rather than as a separate tort.  The existence and viability of the doctrine has

drawn much recent scholarly attention.  *See* Neil S. Abbott, Robert Radasevich, and Keith J.

Shapiro, *A Deeper Look at Deepening Insolvency*, 4 DePaul Bus. & Comm. L. J. 529 (Summer

2006); Sabin Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549 (2005); J.B.

Heaton, *Deepening Insolvency*, 30 J. Corp. L. 465 (Spring 2005); Jay R. Bender, *Deepening

Insolvency in Alabama: Is it a Tort, a Damages Theory or Neither of the Above?*, 66 Ala. Law

190 (May 2005); William Bates, III, *Deepening Insolvency: Into the Void*, 24-1 Am.Bankr.Inst.J.

(March 2005).

Those courts which view the theory as a separate tort impose liabilities on control

persons, professionals, and lenders who fraudulently or negligently prolong the life of a

corporation, thereby increasing the corporation's debt and exposure of creditors.  *See Seitz v.

Detweiler, Hershey and Assocs., P.C. (In re CitX Corp.),* 448 F.3d 672 (3d Cir. 2006); *Official

Comm. Of Unsecured Creditors v. American Tower Corp. (In re Verestar, Inc.)*, 343 B.R. at 479;

*OHC Liquidation Trust v. Credit Swisse First Boston (In re Oakwood Homes Corp.)*, 340 B.R.

510 (Bankr. D. Del. 2006).

Recently, a Delaware chancery court, concerned that the theory of deepening insolvency

"does not express a coherent concept," rejected the doctrine explaining:

> If the board of an insolvent corporation, acting with due diligence and good faith,
> pursues a business strategy that it believes will increase the corporation's value,
> but that also involves the incurrence of additional debt, it does not become a
> guarantor of bad strategy's success.  That the strategy results in continued
> insolvency and an even more insolvent entity does not in itself give rise to a cause
> of action.  Rather, in such a scenario, the directors are protected by the business
> judgment rule.  To conclude otherwise would fundamentally transform Delaware
> law.

*Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 205 (Del. Ch. 2006).

Indeed, it would fundamentally transform Virginia law as well.  No court applying

Virginia law has ever recognized an independent cause of action premised solely upon a

company's economic decline.[32]  Virginia law does not require a financially challenged company to abruptly windup its business affairs and liquidate its assets.  The Board of Directors must remain free to exercise its good faith business judgment that will allow it to pursue strategies the board views as sound to turn the company around.  "[F]iduciaries of an insolvent business might well conclude that the company should continue to operate in order to maximize its 'long term wealth creating capacity' or more generally, its enterprise value.  In fact, chapter 11 is based on the accepted notion that a business is worth more to everyone alive than dead." *Kittay v. Atlantic Bank of N.Y. (In re Global Servs.)*, 316 B.R. at 460; *see NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.").

Simply because a business may be failing does not make the directors personally responsible for insuring the success of the business strategies they decide to pursue.  The fact of insolvency does not change or alter the duty that directors owe.[33]  Insolvency merely adds an additional constituency to whom that fiduciary duty is owed.  Creditors replace shareholders in the hierarchy.[34]  As the Bankruptcy Court observed in *Kittay*, "[p]rolonging an insolvent corporation's life, without more, will not result in liability. . . .  Instead, one seeking to recover for 'deepening insolvency' must show that the defendant prolonged the company's life in breach

---

[32]  The accepted policy in Virginia is to the contrary.  As pointed out by the District Court in *Bank of America v. Musselman,* 222 F.Supp.2d 792, 797 (E.D. Va. 2002), "[t]he Fourth Circuit has held that 'only in extraordinary circumstances are directors liable for corporate debts···[as t]here is a strong public policy of shielding directors from individual liability for corporate debt." *quoting Flip Mortgage Corp. v. McElhone,* 841 F.2d 531, 534-35 (4th Cir. 1988).  In the words of the Supreme Court of Virginia, "to refuse to recognize the immunity for directors and officers constitutes 'an extraordinary exception' to be permitted only when it becomes necessary to promote justice."  *Cheatle v. Rudd's Swimming Pool Supply Co.,* 234 Va. 207, 212, 360 S.E.2d 828, 831 (1987), (*quoting Beale v. Kappa Alpha Order,* 192 Va. 382, 397, 64 S.E.2d 789, 798 (1951).

[33]  In *Bank of America v. Musselman,* 222 F.Supp.2d at 796, n. 5, the court noted that the "[f]iduciary duty traditionally encompasses both the duty of care and the duty of loyalty. *See Smith v. Van Gorkom*, 488 A.2d 858 (Del.Super.Ct. 1985)."

[34]  When a corporation becomes insolvent or in a failing condition, the fiduciary duty of the directors shifts from stockholders to the creditors.  *FDIC v. Sea Pines Co.,* 692 F.2d 973, 976-77 (4th Cir. 1982).

of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt." *Kittay, supra* at 458.

The inability to state a claim that the directors of an insolvent corporation breached the fiduciary duty they owed to the corporation and its creditors cannot be remedied by alleging that the corporation became more insolvent as a result of a failed business strategy.  The Bankruptcy Court for the District of Columbia recently concluded:

> Rather than attempt to "discover" a separate common law tort which must then be neutered, this Court prefers to treat deepening insolvency as a theory of harm that it was always meant to be, and will rely on other, more established (not to mention less convoluted) common law causes of action to ascertain whether the defendants in this case have engaged in a legal wrong for which [the trustee] is entitled to recover.

*Alberts v. Tuft (In re Greater Southeast Community Hosp. Corp. I)*, Adv. Proc. No. 04-10459 (Bankr. D.D.C., Sept. 21, 2006).

The harms sought to be remedied by the Trustee's claim of deepening insolvency necessarily must be addressed under his claim for breach of fiduciary duty.  This Court does not believe that the Supreme Court of Virginia would adopt this new independent tort.  Accordingly, the Trustee has not stated a viable claim for deepening insolvency and Count 13 will be dismissed.

<u>Count 14 – The Trust Fund Doctrine</u>

In Count 14, the Trustee seeks to recover from the Directors and First Reserve under the trust fund doctrine.  The Amended Complaint reads:

> To the extent that the Directors and First Reserve are found by the Court to have transferred property from the Debtors by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, and/or through unconscionable conduct, artifice, concealment, or questionable means, while the Debtors were insolvent, the Directors and First Reserve became personally liable for the property of the Debtor [sic] that was transferred.

The Trustee does not seek only a return of property that was allegedly transferred improperly from the recipients, he also seeks to have the Court find that the Directors and First Reserve are individually liable for participating in the wrongful transfer of the property to others.

The Independent Directors argue that the trust fund doctrine is not a separate cause of action, but instead is a remedy for unlawful distributions.  Further, they argue that the doctrine is not applicable in this case because they did not receive any assets of the Debtors and because they did not engage in any self-dealing.  AMGO I and AMGO II and Fund VI, as well as the First Reserve Directors, also argue that they cannot be held liable under this count because they received no assets of the Debtors.

The trust fund doctrine finds its origin in *Marshall v. Fredericksburg Lumber Co.*, 162 Va. 136, 173 S.E.2d 553 (1934).  A judgment creditor filed a bill in equity in that case to recover corporate funds from individual directors.  The corporation was found to have transferred its assets unlawfully when it repurchased its own stock.  The Supreme Court of Virginia held that it was impermissible for a corporation to repurchase its own stock "if the purchase is injurious or prejudicial to existing creditors and tends to defeat them in the collection of their claims against the corporation."  162 Va. at 148, 173 S.E.2d at 558.

The Supreme Court of Virginia held that the duty of the directors was first and foremost to maximize the corporate assets so as to enable the corporation to pay its debts.  It agreed with the trial court that the redemption of corporate stock was impermissible.  However, it reversed the judgment against one of the directors because he received no corporate funds and did not personally benefit from the transaction.

Subsequently, in *Ashworth v. The Hagen Estates, Inc.*, 165 Va. 151, 181 S.E. 381 (1935), the Virginia Supreme Court observed that, "a corporation holds its property subject to the

payment of the corporate debts," *Id.* at 385, and that, "good intentions will not validate an unlawful transaction." *Id*. at 161, 181 S.E.2d at 385.  The Court held that:

> The assets of a corporation are a trust fund for the payment of its debts upon which the creditors have an equitable lien, both as against the stockholders and all transferees except those purchasing in good faith and for value:  *Id.* at 162, 181 S.E.2d at 385.  (*Bartlett v. Drew*, 57 N.Y. 587; *Brum v. Merchants' Mut. Ins. Co.* [C.], 16 F. [140], 143.)

*Id*. at 162, 181 S.E.2d at 385.

The theory of recovering corporate assets under the corporate trust fund doctrine was applied by the United States Court of Appeals for the Fourth Circuit in the case of *Rapids Constr. Co. v. Malone*, 139 F.3d 892, 1998 WL 110151 (4th Cir. 1998).   There, the Fourth Circuit, interpreting Virginia law in a diversity case, concluded that the trust fund doctrine "gives creditors an equitable right of recovery against shareholders who take assets from a dissolving corporation."  1998 WL 110151, at *4.[35]  "A corporation has no right to purchase its own shares if the substantial rights of either stockholders or creditors will be adversely affected thereby."  *Id.* at *5, citing *Marcuse v. Broad-Grace Arcade Corp.*, 164 Va. 553, 180 S.E. 327, 337 (Va. 1935). *Rapids Construction Co.* specifically rejected the notion that *Marshall v. Fredericksburg Lumber* was really a fraudulent conveyance case.  The Fourth Circuit rested its holding on the trust fund doctrine.

Lower courts in Virginia have also applied the trust fund doctrine, finding it to be a viable cause of action.  In *Lawyers Title Insurance Corp. v. PRT Enterprises, Inc.*, No. 02-2424, 2004 WL 1714892 (Va. Cir. Ct. July 30, 2004), the circuit court held that the controlling shareholders of a corporation have a duty to pay the corporate liabilities to outside creditors before they may receive any of the residuum of the corporation's assets.  The court stated: "The

---

[35]  Similarly, in *Bank of America v. Musselman*, 222 F.Supp.2d 792 (E.D. Va. 2002), the district court held that the Corporate Trust Fund Doctrine was one of the three exceptions for holding officers and directors personally liable for corporate debts.  *Id*. at 798.

trust fund doctrine gives creditors an equitable right of recovery against shareholders who take assets from a dissolving corporation." 2004 WL 1714892, at *5, *Rapids Constr. Co.*, 1998 WL 110151, at *4.

In light of this history of the application of the trust fund doctrine in Virginia, it is clear that the doctrine is not merely a remedy for unlawful distributions, but rather is an independent cause of action under Virginia law. The Trustee has properly asserted a viable claim against the shareholder recipients of the Debtors' assets. The Trustee need not prove that the transfer occurred by commission of some wrong or unconscionable conduct, only that the transfer occurred outside the prescribed order of distribution and harmed creditors. The Trustee does not state a cause of action, however, against the defendants who either did not receive or are not holding corporate assets. Count 14 must therefore be dismissed as to the Outside Directors.

<u>Count 15 – The Trustee States Claim For Breach Of Contract</u>

In Count 15, the Trustee contends that the Dotson Redemption constituted a breach of the Shareholder Agreement, entitling the Trustee to damages or the unwinding of the transaction. Generally a corporation may purchase its own stock, unless prohibited by charter or statutes, if done in good faith without prejudicing its creditors' rights. *Marshall v. Fredericksburg Lumber Co.,* 162 Va. at 147, 173 S.E. at 557. While Dotson concedes that the Trustee properly pleads the elements of breach of contract under Virginia law and the Shareholder Agreement, Dotson claims that the Shareholder Agreement was orally modified by the Directors and the Dotson Redemption did not breach the terms of the modified contract.

Dotson's oral modification argument is a defense to the Trustee's breach of contract claim; it requires an evidentiary showing and therefore cannot be grounds for a motion to dismiss. *See Keepe v. Shell Oil Co.*, 220 Va. 587, 590, 260 S.E.2d 722, 724 (1979). In *Keepe*,

the Supreme Court of Virginia held that the question of whether there had been an oral modification of a written contract must be established by evidence. *Id.* (emphasis added). This is not the appropriate stage of the lawsuit for the evaluation of factual disputes. The Fourth Circuit, in *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004), succinctly noted that the purpose of Rule 12(b)(6) is to test the sufficiency of the complaint and not the sufficiency of the alleged facts. *Id.* at 427. Factual evaluation is a task best reserved for later in the proceedings.

Dotson further argues that Virginia law would not allow for the unwinding of the Dotson Redemption. The Trustee argues that unwinding is an appropriate remedy because the Shareholder Agreement provides that with respect to *any* purported transfers of shares made in violation of the provisions of the Shareholder Agreement, such transactions are void and of no effect. Generally, the parties to a contract may provide the remedy that will be available to them in case of breach, and such remedy is not exclusive unless express language provides for it to be so. *Bender-Miller Co. v. Thomwood Farms, Inc*, 211 Va. 585, 588, 179 S.E. 2d 636, 638-39 (1971). If the Trustee prevails on his breach of contract claim, nothing in Virginia law would prevent him from pursuing any contractually stipulated remedy.

For the foregoing reasons the motion to dismiss Count 15 will be denied.

## CONCLUSION

For the reasons detailed above, the Court will grant Crawford's motions to dismiss counts 1, 2, 3, 5, 6 and 12 to the extent that the Trustee seeks to recover property that was transferred to Crawford under the Crawford Settlement Agreement as modified by the parties that was assumed by the Debtors pursuant to the Debtors' Reorganization Plan. The Court will deny Crawford's motions to dismiss counts 1, 2, 3, 5, 6 and 12 to the extent that the Trustee seeks to avoid the releases Crawford received as part of the Crawford Settlement Agreement or to the extent that

the Trustee seeks to recover property that Crawford may have received outside of the modified

Crawford Settlement Agreement.  Crawford's motion to dismiss count 4 as against Crawford will

be granted.

   The Court will grant the motions of Crawford, J.R. Coal, Varney and Tellmann to dismiss

count 7 as to them.  To the extent that Crawford, J.R. Coal, Varney or Tellmann hold claims

against the Debtors' estate, any such claims will be disallowed.  The Court will grant the motion

of First Reserve to dismiss count 8 as against First Reserve and the motion of the Outside

Directors to dismiss count 14 as against the Outside Directors.  The Court will dismiss count 13.

All of the other motions to dismiss will be denied.  Separate orders shall issue.

ENTERED: _____

_____/s/Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE

**Copies to:**

**Bryan J. Wick**
**Brant C. Martin**
Wick Phillips LLP
500 N. Akard Street, Suite 2100
Dallas, TX 75201

**Daniel Hays Puryear**
**David M. Anthony**
Smythe & Puryear
144 Second Avenue, Ste 333
Nashville, TN 37201

> *Co-counsel for Plaintiff Anthony H. N. Schnelling*

**Lynn L. Tavenner**
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, VA 23219

> *Counsel for Plaintiff Anthony H. N. Schnelling,*
> *as Trustee of the JRCC Unsecured Creditor Liquidating Trust*

**James R. Kelley**
**Marc T. McNamee**
Neal & Harwell
150 4th Ave. N. Ste 2000
Nashville, TN 37219

> *Co-counsel for Defendants:*
> *James B. Crawford*
> *James D. Dotson,*
> *George S. Slocum*
> *John C. Bumgarner, Jr.*
> *A. Hugh Ewing, III*
> *Edward A. Snyder*
> *John R. Tellmann*
> *Derrick Varney*
> *J. R. Coal Associates*

**Samuel W. Hixon, III**
**William H. Schwarzschild , III**
Williams Mullen
1021 East Cary St.,16th Floor
P.O. Box 1320
Richmond, VA 23218

> *Co-counsel for Defendants:*
> *James B. Crawford*
> *J. R. Coal Associates*

**Eugene E. Derryberry**
**Harold David Gibson**
Gentry Locke Rakes & Moore
P.O. Box 40013
Roanoke, VA 24022-0013

> *Co-counsel for Defendant James D. Dotson*

**Gregory J. Kerwin**
Gibson Dunn & Crutcher LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642

**Michael D. Mueller**
**Jennifer McLain McLemore**
Christian & Barton, L.L.P.
909 East Main St., Ste. 1200
Richmond, VA 23219

**Randal Steven Mashburn**
Baker Donelson Bearman & Caldwell
211 Commerce St. Ste 1000
Nashville, TN 37201

> *Co-counsel for Defendants:*
> *William E. Macaulay*
> *Ben A. Guill*
> *John A. Hill*
> *First Reserve Corporation*
> *American Gas & Oil Investors*
> *AMGO II*
> *First Reserve Fund V, L.P.*
> *First Reserve Fund V-2, L.P.*
> *First Reserve Fund VI, L.P.*

**David J. Sensenig**
**Vernon E. Inge , Jr.**
**E. G. Allen, Jr.**
LeClair Ryan
Riverfront Plaza, East Tower
951 East Byrd Street
Post Office Box 2499
Richmond, VA 23218-2499

      *Co-counsel for Defendants:*
        *George S. Slocum*
        *John C. Bumgarner, Jr.*
        *A. Hugh Ewing, III*
        *Edward A. Snyder*
        *John R. Tellmann*
        *Derrick Varney*

**Robert B. Van Arsdale**
Office of the United States Trustee
600 East Main Street, Room 301
Richmond, VA  23219

## EXHIBIT 1

Memorandum Opinion
United States Bankruptcy Court
Eastern District of Tennessee
September 14, 2006

*Marian F. Harrison*
US Bankruptcy Judge

Dated: 09/14/06

# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | **CHAPTER 11** |
| **JAMES RIVER COAL COMPANY,** et al., | **NO. 303-04095** |
| Debtors. | **JOINTLY ADMINISTERED** |
| | **JUDGE MARIAN F. HARRISON** |

---

## MEMORANDUM OPINION

---

This matter is before the Court upon motions to dismiss and/or motions for summary judgment filed by various defendants in the relevant adversary cases. The issue before the Court in these adversary cases is whether the Plan of Reorganization and other "plan documents" adequately preserved certain preference causes of action and certain "insider" causes of action, thus avoiding the res judicata effects of confirmation.[1]

---

[1] While these adversaries involve numerous other issues, the only issue before the Court at this preliminary juncture is whether these preference actions are barred by res judicata.

Three groups of defendants have filed such motions: (1) general preference defendants who allegedly were paid within 90 days of bankruptcy, (2) insider defendants who are charged with, among other things, breach of fiduciary duty, deepening insolvency, fraudulent conveyances, civil conspiracy, unlawful distribution of corporate assets, and rescission, and (3) a third distinct preference defendant, Rothschild Inc., which served as financial advisor to the debtors, approved by Court order entered on May 23, 2003.[2]

After reviewing the voluminous pleadings and memoranda, which were well written by all sides, and after the argument of counsel, the Court finds that the motions by the general preference defendants and the insider defendants should be denied.

## I. UNDISPUTED FACTS

James River Coal Company and related entities (collectively, the "debtors") filed for bankruptcy on March 25, 2003. A Plan of Reorganization was confirmed on April 22, 2004. This Plan and related Liquidating Trust Agreement contemplated the establishment of a trust to garner and distribute all assets. Specifically, with regard to potential causes of action, the Plan contained the following provisions:

> 1.1 (108) "Unsecured Creditor Liquidating Trust Assets" means (a) the Trust Causes of Action; (b) the Rabbi Trust Assets; and (c) the right to receive the Coal Act Refund.

---

[2]Rothschild Inc.'s motion is considered in a separate Memorandum Opinion and Order.

2 - U.S. Bankruptcy Court, M.D. Tenn.

1.1 (10) "Causes of Action" means all rights, claims, causes of action, defenses, debts, demands, damages, obligations, and liabilities of any kind or nature under contract, in tort, at law, or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto, including, without limitation, causes of action arising under Chapter 5 of the Bankruptcy Code or similar state statutes.

1.1 (104) "Trust Causes of Action" means all Causes of Action arising prior to the Effective Date that either (a) accrued to the Debtors as debtors in possession under Chapter 5 of the Bankruptcy Code, including, but not limited to, any and all such Causes of Action against parties who are identified on the Schedules; or (b) accrued to (i) unsecured creditors of the Debtors under applicable non-bankruptcy law prior to the Commencement Date, but are deemed under the Bankruptcy Code and applicable interpretive case law to be derivative of the Estates' interests and therefore became property of the Estates upon the commencement of the Chapter 11 Cases; or (ii) the Debtors or their Estates, in either case including, but not limited to, the Identified Actions; *provided, however,* that Trust Causes of Action shall not include (x) Causes of Action expressly released or discharged under the Plan, including, but not limited to, Causes of Action against the Senior Secured Lenders released pursuant to Section 4.2(i) of the Plan; and (y) the Retained Actions.

1.1 (93) "Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such may be amended or supplemented from time to time.

1.3 Plan Documents. All Plan Documents are incorporated into the Plan by this reference as if set forth in full herein.

The Disclosure Statement at page 6 further provides as follows:

The assumed value of the Unsecured Creditor Liquidating Trust is $3 million, but the actual value may be higher, depending on a number of factors related to the outcome of potential lawsuits and the possibility of future legislation by the United States Congress, all of which are impossible to predict. . . . Among the expenses of the trust are the fees and expenses of the Trustee, the fees and expenses of the advisory board established under the Plan to advise

the Trustee (the "Trust Advisory Board"), and any professional advisors the Trustee retains to investigate and pursue the Trust Causes of Action. It is impossible to predict the likely recoveries, if any, from such lawsuits.

The Chart in the Disclosure Statement at page 8 gives the Trust "the right to the net proceeds, if any, of the lawsuits related to the Trust Causes of Action."

The Disclosure Statement at page 29 states in 4.2:

The Trust Causes of Action give the Trustee the right to bring certain lawsuits against third parties for, among other things, the recoveries of preferences and fraudulent conveyances. The Debtors are unable to estimate the likely recoveries, if any, from pursuit of the Trust Causes of Action. The Trustee and the Trust Advisory Board will have sole responsibility for determining the costs and benefits from pursuing individual lawsuits, and whether and how to pursue those actions. The costs of the Trustee's fees, and the fees of Trustee Professionals, as well as the costs and fees of the Trust Advisory Board, will all have to be paid from lawsuit recoveries or any other Cash available to the trust, before any Cash distributions can be made to the General Unsecured Creditors on account of the Trust Causes of Action. For additional information concerning the Trust Causes of Action, see Section VI.[E].3.c (Treatment of Claims and Interests Under the Plan – Certain Identified Trust Causes of Action) of this Disclosure Statement.

In addition, the Plan set forth the following specific Actions Preserved:

(d)    Actions Preserved. On the Effective Date, . . . (B) any and all Trust Causes of Action shall be preserved and shall vest with the Unsecured Creditor Liquidating Trust. Specific Causes of Action included in the Trust Causes of Action consist of the following (collectively, the "Identified Actions"):

(i)    Fraudulent Conveyance – Potential Defendants: James D. Dotson, First Reserve Corporation, First Reserve Fund V, L.P., First

Reserve Fund V-2, L.P., First Reserve Fund VI, L.P., John Tellman, Derrick Varney;

(ii)    Voluntary Conveyance – Potential Defendants: James D. Dotson, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P., John Tellman, Derrick Varney;

(iii)    Breach of Fiduciary Duty and Negligence – James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill, George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley;

(iv)    Unlawful Distribution of Corporate Assets – James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill, George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley;

(v)    Civil Conspiracy – James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill, George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.;

(vi)    Recission – First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.;

(vii)    Deepening Insolvency – First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.;

(viii)    Aiding and Abetting Breach of Fiduciary Duty – First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.;

(ix)    Trust Fund Doctrine – James D. Dotson, Derrick Varney, John Tellman, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.;

(x)    Fraudulent Transfer – James D. Dotson, James B. Crawford;

5 - U.S. Bankruptcy Court, M.D. Tenn.

*provided, however,* that the foregoing list of Identified Actions and potential defendants is not exhaustive and if a specific Trust Cause of Action or defendant is not identified in this list, it is because such Trust Cause of Action and/or defendant is not known to the Committee at this time. On behalf of the Unsecured Creditor Liquidating Trust and their Estates, the Debtors reserve their rights to any other Trust Causes of Action not specifically referenced herein that may be identified on and after the Effective Date during litigation and formal discovery. A description by the Committee of the asserted factual predicates for the Identified Actions is set forth in the Disclosure Statement at Section VI.[E].3.c and is incorporated herein as if set forth in full herein.

In addition, the Disclosure Statement at pages 37-39 sets forth the following regarding the "Certain Identified Trust Causes of Action":

The Committee has provided the Debtors with the following statement concerning certain specific Causes of Action which the Committee has identified (the "Identified Actions") as being part of the Trust Causes of Action:

"Prior to the Plan being filed with the Bankruptcy Court, the Committee investigated potential claims resulting from or accruing prior to the bankruptcy filings of the Debtors, including the occurrence of certain equity stock redemptions and related transfers (collectively, the "Redemptions") made by James River to certain insiders (as the term is defined in Bankruptcy Code Section 101(31)). The Committee believes that the factual essence of the Redemptions is that the James River Board of Directors (the "Board"), under the direction and control of First Reserve, approved the Redemptions to certain insiders at a time when James River and its affiliated Debtors were insolvent, or were rendered insolvent as a result of the Redemptions being made. The Redemptions investigated by the Committee include, but are not limited to, the redemptions of stock owned by (i) James Dotson in 1999; (ii) Williams Co. ("Williams") in 1998 and 1999; (iii) Derrick Varney in 2000; (iv) John Tellman in 2000; and (v) First Reserve in 2000. The Redemptions totaled approximately $57 million.

"More specifically, the Committee believes that Mr. Dotson received an approximately $12 million stock redemption (the "Dotson Redemption") as a result of his position on the Board at a time when James River was insolvent, or was rendered insolvent. The Committee further believes that neither James River, nor its affiliated Debtors, had immediately available funds to make the

Dotson Redemption, thus, forcing James River to borrow the funds. Further, the Committee believes that without explanation or known justification, the Board approved the amount of the Dotson Redemption, and deviated from its past practice of issuing an unsecured promissory note in completing the same. In addition, the Committee asserts that during the same relevant time periods and based upon the same or similar facts, Williams and Messrs. Varney, and Tellman received stock redemptions (collectively, the "Other Redemptions") in the aggregate amount of $10.4 million.

"The Committee believes that with respect to First Reserve, at the time the Board approved its stock redemption (the "FR Redemption"), James River possessed and could have exercised a contractual right pursuant to a redemption and put/call agreement (the "Agreements") to issue an unsecured promissory note in exchange for First Reserve's stock. However, the Committee believes that with insider access to information related to the poor financial condition of James River, First Reserve demanded the FR Redemption be paid immediately in cash and refused to accept a promissory note. In addition, upon its investigation of the FR Redemption, the Committee believes that First Reserve, via two of its Board members and its supermajority control of James River, threatened to derail a pending credit facility in favor of James River and its affiliated Debtors unless James River modified the Agreements and made the FR Redemption payment in cash. The Committee asserts that the FR Redemption was approximately $35 million.

"The Committee further asserts that in order to complete the FR Redemption, the Dotson Redemption, and the Other Redemptions, additional secured indebtedness was authorized by the Board to be incurred by the Debtors, thereby deepening their insolvency. The Committee believes that the FR Redemption, the Dotson Redemption, and the Other Redemptions, among other possible unknown transfers, left the Debtors with significant additional secured bank debt obligations, ultimately making them unable to pay their secured and unsecured creditors.

"In addition, the Committee believes that immediately prior to the Commencement Date, the same Board forgave millions of dollars of loans (the "Insider Loans") owed to the Debtors by James Crawford and Mr. Dotson. The Committee asserts that thereafter, the underlying collateral for the Insider Loans, without any known consideration being paid in exchange, was turned over by the Board to Crawford."

The Committee has asserted that as of the date of this Disclosure Statement, the Identified Actions consist of the following; *provided, however,* that the Committee has asserted that the following list of Causes of Action and potential defendants is not exhaustive and that if a specific Cause of Action or defendant is not identified in the following list, it is because such Cause of Action or defendant is not known at this time and, at the request of the Committee and on behalf of the Unsecured Creditor Liquidating Trust and the Estates, the Debtors reserve their rights to any other Trust Causes of Action not specifically referenced in the following list that may be identified following the Effective Date during the litigation and formal discovery process contemplated with respect to the Trust Causes of Action:

(i)     Fraudulent Conveyance – Potential Defendants: James D. Dotson, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P., John Tellman, Derrick Varney.

(ii)    Voluntary Conveyance – Potential Defendants: James D. Dotson, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P., John Tellman, Derrick Varney.

(iii)   Breach of Fiduciary Duty and Negligence – James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill, George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley.

(iv)    Unlawful Distribution of Corporate Assets – James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill, George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley.

(v)     Civil Conspiracy – James B. Crawford, James D. Dotson, A. Hugh Ewing, III, John A. Hill, Benjamin A. Guill, George S. Slocum, John C. Bumgarner, Jr., Edward A. Snyder, William A. MacCauley, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.

(vi)    Recission – First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.

8 - U.S. Bankruptcy Court, M.D. Tenn.

(vii)   Deepening Insolvency – First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.

(viii)   Aiding and Abetting Breach of Fiduciary Duty – First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.

(ix)   Trust Fund Doctrine – James D. Dotson, Derrick Varney, John Tellman, First Reserve Corporation, First Reserve Fund V, L.P., First Reserve Fund V-2, L.P., First Reserve Fund VI, L.P.

(x)   Fraudulent Transfer – James D. Dotson, James B. Crawford.

On April 9, 2004, the Official Committee of Unsecured Creditors filed notice of its appointment of Anthony H.N. Schnelling and Bridge Associates LLC (hereinafter "Trustee") as liquidating trustee. In March 2005, the Trustee filed 310 adversary complaints, including the ones discussed herein, on behalf of the Liquidating Trust.

## II. STANDARD OF REVIEW

The defendants filed their motions pursuant to Fed. R. Bankr. P. 7012, or alternatively, under Fed. R. Bankr. P. 7056. Because the Court has reviewed evidence from outside the pleadings in these adversary proceedings, it will review the motions under the summary judgment standard. *See, e.g., Benzon v. Morgan Stanley Distrib., Inc.,* 420 F.3d 598, 603 (6th Cir. 2005) ("Ordinarily, when a district court considers evidence outside the

pleadings, a 12(b)(6) motion will 'be treated as one for summary judgment and disposed of as provided in Rule 56.'") (quoting Fed. R. Civ. P. 12(b)(6)).

Federal Rule of Civil Procedure 56(c), as incorporated by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and/or discovery materials which demonstrate that there is no genuine disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets that initial burden, the burden is shifted to the nonmoving party to go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and/or admissions, designate specific facts showing that a genuine issue of fact does remain for trial. *Id.; see also Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990) (nonmoving party "must show sufficient evidence to create a genuine issue of material fact" to prevail).

## III. DISCUSSION

The confirmation of a Chapter 11 plan constitutes a final judgment in bankruptcy proceedings. *Browning v. Levy,* 283 F.3d 761, 772 (6th Cir. 2002) (citing *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.,* 973 F.2d 474, 480 (6th Cir. 1992)). Thus, confirmation of a Chapter 11 plan can be preclusive of preference and other causes of action on principles of res judicata. However, under 11 U.S.C. § 1123(b)(3), preclusion can be prevented by providing in the plan for the preservation of those actions:

Subject to subsection (a) of this section, a plan may--

* * * *

(3) provide for--

> (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

> (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest.

Although 11 U.S.C. § 1123(b)(3) does not set forth the language necessary or sufficient to preserve a particular claim or cause of action, Judge Lundin has set forth an extensive discussion and analysis of this issue in *Elk Horn Coal Co., LLC v. Conveyor Mfg. & Supply, Inc. (In re Pen Holdings, Inc.),* 316 B.R. 495, 504 (Bankr. M.D. Tenn. 2004):

Read in the context of its history, § 1123(b)(3) protects the estate from loss of potential assets. It is not designed to protect defendants from unexpected lawsuits. The words sufficient to satisfy § 1123(b)(3) must be measured in the

11 - U.S. Bankruptcy Court, M.D. Tenn.

context of each case and the particular claims at issue: Did the reservation allow creditors to identify and evaluate the assets potentially available for distribution?

## A. <u>PREFERENCE ACTIONS</u>

In *Pen Holdings*, the plan defined avoidance actions to include "all preference claims under Section 547," and it included avoidance actions as retained causes of action to be pursued. The Disclosure Statement included avoidance actions in its description of "Other Assets." The statement of financial affairs included a list of payments made within the preference period. Based on these facts, Judge Lundin held that the plan preserved preference actions:

> This outcome is influenced by the fact that preference litigation is fundamentally different than the legal malpractice and breach of duty claims in *Browning*. The universe of causes of action that become assets of Chapter 11 estates and that might be the objects of preservation at confirmation under § 1123(b)(3) is immense. But almost every debtor that comes into Chapter 11 has made payments to creditors during the 90 days or one year (insiders) before bankruptcy. Potential preference actions are often numerous (for example, $6 billion in *Kmart*) and require extensive accounting and prefiling preparation by the debtor or trustee. Preference litigation is not often initiated, and more rarely completed, before confirmation of a plan in Chapter 11 cases.

> It is not practicable, especially in larger cases, for the debtor to identify by name in the plan or disclosure statement every entity that may have received a preferential payment.

*Id.* at 504.

12 - U.S. Bankruptcy Court, M.D. Tenn.

As in *Pen Holdings*, the preference actions were preserved in the present case. The Plan specifically preserved "actions under chapter 5 of the Bankruptcy Code." That preference and fraudulent conveyance claims would be assets of the Liquidating Trust, to be investigated and prosecuted by the Trustee, was disclosed in the Disclosure Statement. In addition, creditors were informed in the Disclosure Statement that it was not possible at that time to predict the outcome or value of those causes of action, and it should not have been a surprise that many preference actions would be filed just as in other large cases. Finally, the debtors' Statements of Affairs identified payments made by the debtors within 90 days before the bankruptcy. Accordingly, as to the Trustee's claims seeking to avoid transfers within the 90 days prior to bankruptcy, the Court finds that sufficient notice was given in the debtors' Plan and Disclosure Statement to preserve the Trustee's causes of action, and thus, these actions are not barred by res judicata.

## B. INSIDER ACTIONS

The same is true with regard to the claims against the insider defendants. These defendants assert that by providing detailed information about some of the insider defendants and some of the claims, that the Trustee is now precluded from asserting unspecified claims and from bringing claims against unnamed defendants.

Ironically, just as the preference defendants ask this Court to penalize the Trustee because of the lack of information given, the insider defendants ask the Court to penalize the

13 - U.S. Bankruptcy Court, M.D. Tenn.

Trustee because the information about these types of defendants given was too detailed.

However, the Court finds that these claims were preserved by the language contained in the

Disclosure Statement and Plan.  In addition to the known claims (that were set forth in great

detail), the Plan further stated that "the foregoing list of Identified Actions and potential

defendants is not exhaustive and if a specific Trust Cause of Action or defendant is not

identified in this list, it is because such Trust Cause of Action and/or defendant is not known

to the Committee at this time."  Similar language was contained in the Disclosure Statement.

The Court finds that this was sufficient notice under *Pen Holdings* and that the motions filed

by the insider defendants should be denied as well.


## IV.  CONCLUSION

Accordingly, the Court finds that the debtors' Plan of Reorganization and other "plan

documents" adequately preserved the preference and "insider" causes of actions, thus

avoiding the res judicata effects of confirmation.


The Trustee shall submit an order in each of the relevant adversary proceedings that

incorporates the Court's findings and denies the motions for summary judgment.  Discovery

deadlines will be discussed at the next Omnibus Hearing, scheduled for October 12, 2006.


**This Memorandum Opinion was signed and entered electronically as indicated
at the top of the first page.**


14 - U.S. Bankruptcy Court, M.D. Tenn

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.